USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: FEB 01 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA         :

     -v-                          :

KAREEM SERAGELDIN,               :

       Defendant.             :

- - - - - - - - - - - - - - - x

# 12 CRIM 09 0

<u>INDICTMENT</u>

12 Cr.

<u>COUNT ONE</u>
(Conspiracy To Falsify of Books
and Records and Commit Wire Fraud.)

    The Grand Jury charges:

### Relevant Persons and Entities

    1.   At all times relevant to this Indictment, Credit Suisse Group ("CS") was a global financial services company headquartered in Zurich, Switzerland.  CS was organized into three divisions, Investment Banking, Private Banking and Asset Management.

    2.   At all times relevant to this Indictment, CS's American Depository Receipts traded on the New York Stock Exchange.

    3.   At all times relevant to this Indictment, CS was required to comply with the federal securities laws, which are designed to ensure that a company's financial information is accurately recorded and accurately disclosed to the public. Specifically, pursuant to the Securities Exchange Act of 1934 and



the rules and regulations promulgated thereunder, CS was required, <u>inter alia</u>, to make and keep books, records, and accounts that accurately and fairly reflected CS's business transactions.

4.  At all times relevant to this Indictment, KAREEM SERAGELDIN, the defendant, was employed at CS as a Managing Director, where he held the position of Global Head of the Structured Credit Group in the Securities Department of the Investment Banking Division.  The Structured Credit Group, among other things, warehoused and traded ABS ("Asset Backed Security") cash bonds, which included Residential Mortgage Backed Securities ("RMBS") and Commercial Mortgage Backed Securities ("CMBS"). SERAGELDIN divided his time between the London, United Kingdom and the New York, New York offices of CS.

5.  During the relevant time period, KAREEM SERAGELDIN, the defendant, oversaw and managed a number of trading books, including a trading book known as "ABN1."  The ABN1 book was comprised primarily of several thousand individual long and short subprime-related positions.  The long positions consisted of, among other things, various types of cash securities, including AAA-rated and non-AAA-rated cash bonds. About 500 single name ABS cash bonds, half of which were originated during the second half of 2005 or later, accounted for

2

$3.5 billion of the ABN1 book.  Prior to March 2008, ABN1 had a net asset value of approximately $5.35 billion, approximately $3.71 billion of which consisted of ABS cash bonds, including RMBS and CMBS positions.

6.    At all times relevant to this Indictment, David Higgs was employed as a Managing Director in the Investment Banking Division at CS.  Higgs was based in CS's London, United Kingdom office.  Higgs reported directly to KAREEM SERAGELDIN, the defendant.

7.    At all times relevant to this Indictment, Salmaan Siddiqui was employed at CS, where he held the title of Vice President.  Siddiqui and another co-conspirator not named as a defendant herein ("CC-1") were responsible for the day-to-day marking of two trading books overseen by KAREEM SERAGELDIN, the defendant, including the ABN1 book.  Both Salmaan Siddiqui and CC-1 were based in CS's New York, New York office.  They generally reported to Higgs, who in turn reported to SERAGELDIN.

8.    At all times relevant to this Indictment, another co-conspirator not named as a defendant herein ("CC-2") was a CS employee responsible for data entry in the ABN1 book, among other things.  CC-2 was based in CS's London, United Kingdom office.

**Background**

9.    CS traders were required at all times to price securities they held at their fair value, that is, on a "mark-to-market" basis, determined by reference to the current market price of the asset or liability, or the current market price for a similar asset or liability.

10.    The deterioration throughout 2007 of the real estate market in the United States, including the subprime housing market, led to significant reductions in valuations of mortgage-backed securities.  As mortgage delinquencies increased across the country, the value of the securities backed by these mortgages decreased and the market for them became increasingly illiquid.

11.    In the absence of a liquid market, CS traders were required to look to other indicia in order to determine the fair value of the assets on their books.  For example, during this time the ABX Index served as a benchmark for certain securities backed by home loans.  It was widely understood within CS that traders were to consult the corresponding ABX indices when pricing RMBS bonds and related products.

4

## Overview of The Scheme To Defraud

12.  From at least in or about August 2007, through and including in or about February 2008, KAREEM SERAGELDIN, the defendant, together with his co-conspirators, manipulated and inflated ABS cash bond position markings in the ABN1 book in order to achieve specific daily and month-end Profit & Loss ("P&L") objectives; in other words, they artificially increased the price of bonds in order to create the false appearance of profitability in that trading book.  SERAGELDIN engaged in, and directed, this scheme in order to enhance his apparent job performance and his eligibility for a promotion and bonuses from CS.

13.  As a result of the scheme executed by KAREEM SERAGELDIN, the defendant, and others, there was a growing disparity between the values ascribed to the marks in the ABN1 book and the available external benchmarks, such as the ABX Index.  Indeed, from at least in or about August 2007 through the end of 2007, as ABX Index prices fell, bond prices in ABN1 that corresponded to the ABX Index remained effectively stable.

14.  During the relevant time period, KAREEM SERAGELDIN, the defendant, directed Higgs on numerous occasions to reach specific P&L targets on a daily and month-end basis. Higgs, in turn, instructed Siddiqui, CC-1 and CC-2 to mark the

5

books so as to achieve the particular P&L targets specified by SERAGELDIN, rather than to reflect the fair value of the bonds. To accomplish this goal, SERAGELDIN and his co-conspirators, among other things, marked up bond prices without regard to fair value; improperly offset mark-downs with gains realized in other parts of the book to avoid a P&L impact; and engaged in the practice of "reversing out," which involved freezing marks at a favorable point in time to achieve a desired P&L result.

15. As a result of the scheme, KAREEM SERAGELDIN, the defendant, and his co-conspirators, gave CS senior management the false impression that the ABN1 book was profitable, and caused CS to report false year-end numbers for 2007. At the same time, SERAGELDIN was able to secure a significant year-end bonus for himself because, as he was well aware, bonus amounts were largely determined by trading books' profitability.

**SERAGELDIN And His Co-Conspirators Knowingly Mismarked Bonds In Order To Achieve P&L Targets And Hide Losses**

16. Beginning in or about the fall of 2007, KAREEM SERAGELDIN, the defendant, and his co-conspirators, began to manipulate the bond marks in the ABN1 trading book in order to hide their declining value and create the false appearance that the ABN1 book was profitable. Set forth below are examples of conversations, recorded pursuant to CS's London office policy, in

which SERAGELDIN and his co-conspirators discussed, among other things, their P&L objectives, their efforts to reach these P&L goals, and their awareness that bonds in the ABN1 book were significantly mismarked.

17. During a telephone call on or about September 13, 2007, for example, CC-2 informed KAREEM SERAGELDIN, the defendant, that there was a $10 million gain that was going to be used to "write down some positions in ABN." When SERAGELDIN asked "which positions?," CC-2 responded: "Just some bonds that were over-priced." CC-2 then asked SERAGELDIN what P&L targets he wanted to be met that day: "If you want [P&L] to be a big number let me know what you want, then I'll just go through it with [Higgs] because obviously I can move things back to where they were ... if you're looking for a big number today ..." SERAGELDIN told CC-2 he would call Higgs to discuss this matter. Before SERAGELDIN reached Higgs, however, CC-2 told Higgs to get in touch with SERAGELDIN "fast" because CC-2 had told SERAGELDIN that they were "up 15 or 20" million dollars "in ABN1" and that SERAGELDIN was "expecting to take some of that as P&L"; that is, SERAGELDIN wanted to show that amount as profit instead of using it to offset losses in other parts of the trading book. Higgs later called CC-2 and confirmed that, just as SERAGELDIN had indicated, SERAGELDIN and his co-conspirators would have to "show

7

some" P&L; therefore, the money gained could not all be used to "write down," or reduce the value of, the over-priced bonds.

18. During a call the following month, on or about October 26, 2007, KAREEM SERAGELDIN, the defendant, and Higgs discussed the P&L of each of the books, which Higgs estimated to be "up 56," or $56 million. Higgs then informed SERAGELDIN that the prices on AAA bonds needed to be marked down. SERAGELDIN asked "how much" of the $56 million Higgs wanted to "take ... to reserve against other things?," referring to the group's practice of using a particular day's gains to hide losses by waiting until a profitable day in order to do necessary write-downs. Higgs proposed a $15 to $20 million markdown. SERAGELDIN did not accept Higgs's proposal: "That's a lot of money, dude." Higgs reminded SERAGELDIN that, among other things, "there are some AAAs" -- i.e., AAA-rated bonds -- "that do need to be marked down." SERAGELDIN told Higgs to "go with 15 [million] for now," and stated that he wanted to "be up 30" -- i.e., $30 million in P&L -- because he was "trying to get a message across to some people." In other words, SERAGELDIN wanted to demonstrate to CS senior management that his trading books were profitable.

19. At month-end, on or about October 31, 2007, KAREEM SERAGELDIN, the defendant, called CC-2 and indicated that he had seen CC-1's bond re-marks and thought they were too low.

SERAGELDIN asked CC-2, "What happened?"  CC-2 said, "I don't really know ....  Let me find out from [CC-1] where we are." SERAGELDIN stated that CC-1 "may have taken the re-marks a little too far," and said that he would talk to Higgs.  Not long after this call, CC-1 called CC-2 to say that Higgs wanted CC-2 to reverse the $25 million re-marks that CC-1 had made.

     20.  The P&L objectives of KAREEM SERAGELDIN, the defendant, were increasingly complicated by the sharp decline of the ABS bond prices in the ABN1 book.  As SERAGELDIN was well aware, ABS cash bond prices, and especially AAA bond prices, were falling precipitously.  In a telephone call on or about October 18, 2007, Higgs informed Siddiqui and CC-1 that SERAGELDIN wanted them to "reduce the AAA assets," and, while noting that this was "obviously not a good time" because of their low value, they needed to "basically do it."  Siddiqui asked, "are we prepared to sell them anywhere from five to seven points lower than where even ... the marking service would be?"  Higgs repeated that "the idea is to get rid of them."  As Higgs stated, "these things are a big thing that can hurt us on a mark to market basis."

     21.  By at least late November 2007, KAREEM SERAGELDIN, the defendant, was aware that the market for mortgage-backed securities had declined enormously.  For example, on or about November 28, 2007, SERAGELDIN told Higgs, Siddiqui and CC-1 that

"the housing market [was] going down the tubes" and that they had to "find a way to sell these bonds," referring to the mortgage-backed bonds in ABN1.  As SERAGELDIN recognized, "[t]hose bonds are going to start trading worse than the [ABX] Index."  In a later call between Higgs, Siddiqui and CC-1, CC-1 indicated that the market prices for the AAA bonds -- which SERAGELDIN and his co-conspirators were marking in the 90s -- were in reality "in the low 80s."  Ultimately, SERAGELDIN made the decision not to sell the bonds because the prices were so low.

### SERAGELDIN And His Co-Conspirators Hide the Mismarks By Deflecting Inquiries from Internal Controls

22.  At all times relevant to this Indictment, price testing was an independent function with the Investment Banking division of CS ("Price Testing"), which was designed to ensure the accuracy of bond prices.  As part of their scheme, KAREEM SERAGELDIN, the defendant, and his co-conspirators, concealed their manipulation of bond marks from Price Testing and devised ways to avoid detection of their fraud.

a.  For example, on or about August 29, 2007, in anticipation of scrutiny of certain month-end marks from Price Testing and senior management, Higgs instructed Siddiqui to obtain third-party marks from other dealers, intending to use these external marks as support when persuading Price Testing to

accept the group's high marks for approximately 30 RMBS positions in ABN1. Siddiqui thereafter contacted Deutsche Bank and Barclays Capital, only to learn that the banks' marks were substantially lower than the marks Siddiqui had made in ABN1. Higgs informed KAREEM SERAGELDIN, the defendant, of this development: "The one bit of bad news at the moment is ... we got two sets of bond marks, two things from Deutsche and Barclay's, and they were not entirely good ... their numbers they came back with were lower than the bond marks so we've gone out again to a number of different people to see if they will give us bond marks."

b.   Siddiqui subsequently sought the help of a friend who worked at a small regional investment bank in order to secure "independent" marks. In less than a minute, Siddiqui's friend generated prices on a number of AAA bonds that were nearly identical to those recorded by Siddiqui and his co-conspirators in the ABN1 book.

23.   On another occasion, a Price Testing representative sent an e-mail to Higgs and Siddiqui, in which the representative questioned a bond price: "Curious to know how the desk derived a price of $103.36 for [a particular bond] .... We're looking at a price in the mid 70's range." In response, Siddiqui acknowledged that Price Testing was correct and told the

Price Testing representative that "the feed from Bloomberg into [his] price sheet did not pick up the rating downgrade," and had caused the higher mark to be recorded by mistake.  The Price Testing representative forwarded Siddiqui's e-mail to other members of Price Testing with the note, "F/Y/I I'm not exactly comfortable with this response.  Makes me wonder how carefully [the front office] is looking at these prices."

24.  KAREEM SERAGELDIN, the defendant, also made efforts to thwart Price Testing's ability to evaluate his books' marks.  In or about late December 2007, SERAGELDIN, dissatisfied with the year-end P&L number in a different trading book, and in an effort to forestall aggressive inquiries by Price Testing, instructed Higgs and another trader to select four positions that Price Testing could not test and to increase the prices in order "to make back the money."

### Late 2007: Risk Management Begins To Question The Bonds

25.  In or about late 2007, senior members within CS's Risk Measurement & Management ("RMM") department began to raise questions about the valuation of AAA bonds in the ABN1 book.  On or about November 30, 2007, the head of Market Risk Management ("MRM"), a function within RMM, informed KAREEM SERAGELDIN, the defendant, via e-mail that the AAA bonds in the ABN1 book

12

appeared to be priced too high versus the ABX Index:

> The weighted average AAA paper looks to
> be priced around 90% (see attached
> excel). The figures seem pretty high to
> me (versus ABX), and wanted to know if I
> was missing something/had taken the wrong
> data.

In response to this inquiry, SERAGELDIN promised to review the

data while downplaying the similarity of his bonds to the ABX:

> Will have someone take a look. Portfolio
> mix a bit different in that a good
> portion is non LCF and another portion is
> fixed rate underlying loans.

In other words, SERAGELDIN represented that the bonds in ABN1

were not comparable to the ABX Index because "a good portion" of

the ABN1 bonds were "non LCF," that is, they were not Last Cash

Flow and were therefore more valuable. SERAGELDIN further

suggested that ABN1 bonds were of higher value because they

consisted of "fixed rate," as opposed to floating rate underlying

loans.

     26.   KAREEM SERAGELDIN, the defendant, later forwarded

the e-mail from the head of MRM to Higgs and asked Higgs to

analyze the AAA ABN1 portfolio so that SERAGELDIN could form a

"counter-argument," _i.e._, so SERAGELDIN could convince MRM that

the ABN1 bonds were of higher value than the ABX Index in order

to justify the high marks. Higgs thereafter asked Siddiqui to

conduct the requested analysis, which Siddiqui did. The

resulting spreadsheet, which Siddiqui distributed to SERAGELDIN, Higgs and CC-1 via e-mail on or about December 3, 2007 (the "December 3 Spreadhsheet"), showed, among other things, that those bonds in SERAGELDIN's trading books that were most comparable to the ABX Index – i.e., the AAA "LCF" ("Last Cash Flow") floating rate bonds – were valued at weighted average prices above 90, or 15 points higher on average than the corresponding ABX Indices.  SERAGELDIN did not share the December 3 Spreadsheet with the head of MRM.

27.  On or about the following day, KAREEM SERAGELDIN, the defendant, met with Higgs, Siddiqui and CC-1 in the New York, New York offices of CS.  During that meeting, the group discussed its AAA bond exposure with reference to the December 3 Spreadsheet.  Although SERAGELDIN expressly acknowledged that the AAA bonds were priced too high and that a more accurate price would be closer to the ABX Index, SERAGELDIN instructed Higgs, Siddiqui and CC-1 not to make any significant markdowns at that time.

28.  Instead, on or about December 7, 2007, in response to a request from CS's Chief Risk Officer for an assessment of subprime exposure, KAREEM SERAGELDIN, the defendant, sent an e-mail with the subject title "RMBS AAA Follow-Up."  In that e-mail, SERAGELDIN represented to the Chief Risk Officer that the

14

"performance" of his AAA bonds was "dramatically better" than the ABX Index because they were "predomina[ntly] ... backed by fixed rate mortgages," as opposed to floating rate mortgages. SERAGELDIN further represented to the Chief Risk Officer, among other things, that "a little over half of the total [was] not last cash flow (LCF)," whereas the December 3 Spreadsheet reflected that approximately 60% of the AAA bonds were Last Cash Flow.  Further, SERAGELDIN did not disclose to the Chief Risk Officer that the December 3 Spreadsheet showed that, as of November 30, the LCF bonds most comparable to the ABX Index were valued in the ABN1 book at weighted average prices above 90.

**2007 Year-End:**
**The Mismarkings In The ABN1 Book Continue**

29.  On or about December 31, 2007, Higgs instructed Siddiqui regarding year-end marks for AAA bonds in ABN1. Specifically, Higgs noted that the LCF bond marks for the second half of 2006 and the first half of 2007 in the ABN1 book were "a bit too high" and asked Siddiqui, "Can we push those down into the 80s?"  Higgs then directed Siddiqui to "figure out which bonds we can re-mark against them" in order to flatten, or even out, the P&L impact.

30.  On or about the following day, Siddiqui sent Higgs an e-mail with a spreadsheet that included AAA LCF marks for

month-end December 2007.  In the e-mail, Siddiqui noted that he
re-marked the book by (1) reducing the weighted average prices of
certain vintages of LCF bonds to below $90; and (2) making as
many offsetting marks as possible.  Instead of marking the bonds
down to accurate levels, however, Siddiqui marked the weighted
average prices at 89.9, an adjustment "into the 80s" that was
designed to avoid scrutiny.  Moreover, the "offsetting marks"
that Siddiqui claimed to have done in ABN1 lacked any correlation
to the AAA LCF bonds.

    31.  A few days later, on or about January 4, 2008,
KAREEM SERAGELDIN, the defendant, and Higgs discussed the AAA
bonds within the ABN1 book.  Specifically, SERAGELDIN stated:
"The dollar prices of our [AAA] floating rates and fixed rates
honestly are quite high, right?"  Higgs responded, "I agree they
are quite high" and that "they definitely should be marked down."
Later in the conversation, SERAGELDIN expressed concern that the
overpriced bonds were at risk of being discovered:  "We should
mark these down because someone is going to spot this."
SERAGELDIN further remarked that "on the fixed rates we have some
room, but not on the floating rates, we don't."  In other words,
SERAGELDIN acknowledged that the floating rate bonds could not be
marked any higher.  Additionally, SERAGELDIN informed Higgs that
another trader who reported to SERAGELDIN and oversaw a

comparable portfolio of bonds was pricing his floating rate AAA bonds below the ABX Index.

32. Nevertheless, just a few days later, on or about January 9, 2008, KAREEM SERAGELDIN, the defendant, reminded Higgs that CS senior management expected their books to generate substantial revenue, stating, in part, "People are expecting us to make money. [The head of CS's investment bank] knows what our positions are. Today, we have to be up at least 10 [million] bucks." SERAGELDIN recognized, however, that any effort to find positive P&L was complicated by their history of mismarking positions: "I know it's hard when you've got things that aren't necessarily quite marked where they need to get marked."

33. Although the AAA bonds in the ABN1 book were written down by approximately $35 million in the first half of January 2008, they nevertheless remained grossly overpriced in comparison to the ABX Index. At January 2008 month end, Siddiqui and CC-1, at the direction of Higgs, raised the prices on a number of AAA LCF bonds above their year-end levels.

### SERAGELDIN's Anticipated Promotion And Year-End Bonus

34. Through his scheme to fraudulently mismark positions in his trading books in order to achieve specific P&L targets, KAREEM SERAGELDIN, the defendant, sought to give the false impression to CS senior management that the ABN1 book was

profitable, when in fact it was losing value precipitously.

35.   The objective of KAREEM SERAGELDIN, the defendant, in maintaining the appearance of profitability was twofold. First, SERAGELDIN sought to impress CS senior management in order to advance his own position at the bank.   In fact, and as SERAGELDIN was well aware, beginning in or about late 2007, he was in serious contention for a new and important position at CS.

36.   Second, KAREEM SERAGELDIN, the defendant, sought to maximize his year-end compensation.   Bonus awards, as SERAGELDIN well knew, were closely tied to the performance of the trading books.

37.   In or about the beginning of February 2008, SERAGELDIN received his compensation for 2007:  $7,279,497, which consisted a salary of approximately $279,497; a cash bonus of approximately $1,700,625; and a CS Group Master Share Plan Incentive Share Unit Award of approximately $5,299,375 (equaling approximately 99,725 CS units).   The CS units were subsequently rescinded following SERAGELDIN's termination from CS.

### The February 2008 Mark-Down

38.   On or about March 20, 2008, CS issued a press release, announcing completion of its internal review and stating that the fair value reduction, or write-down, of the ABS positions - which includes but is not limited to the ABN1 book -

was approximately $2.65 billion.

39.  Approximately $540 million of this write-down was attributable to the ABN1 trading book and included ABS cash bonds for the fourth quarter 2007 that KAREEM SERAGELDIN, the defendant, manipulated and inflated in connection with his scheme.

### Statutory Allegations

40.  From at least in or about August 2007, through and including in or about February 2008, in the Southern District of New York and elsewhere, KAREEM SERAGELDIN, the defendant, together with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, (a) falsification of books and records, in violation of Sections 78m(b)(2)(A), 78m(b)(5) and 78ff of Title 15, United States Code, and Title 17, Code of Federal Regulations, Section 240.13b2-1; and (b) wire fraud, in violation of Title 18, United States Code, Section 1343.

### Objects of the Conspiracy

### False Books and Records

41.  It was further a part and an object of the conspiracy that KAREEM SERAGELDIN, the defendant, and others known and unknown, willfully and knowingly, would and did,

directly and indirectly, falsify and cause to be falsified books, records, and accounts subject to Section 13(b)(2) of the Exchange Act of 1934, namely books, records, and accounts of Credit Suisse, an issuer with a class of securities registered pursuant to Section 12 of the Securities and Exchange Act of 1934, which Credit Suisse was required to make and keep in reasonable detail, accurately and fairly reflecting the transactions and dispositions of the assets of Credit Suisse, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-1.

## Wire Fraud

42.    It was a part and an object of the conspiracy that KAREEM SERAGELDIN, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting to do so, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, all in violation of Title 18, United States Code, Section 1343.

## Means and Methods of the Conspiracy

43.   Among the means and methods by which KAREEM SERAGELDIN, the defendant, and his co-conspirators, would and did carry out the conspiracy were the following:

a.   SERAGELDIN and his co-conspirators recorded and caused others to record falsely inflated marks for ABS cash bonds in the ABN1 book.

b.   SERAGELDIN and his co-conspirators thwarted efforts by CS personnel to determine accurate levels of the ABS cash bonds by, among other things, providing misleading and incomplete information in response to inquiries.

c.   Siddiqui used false "independent" marks that were obtained through-round-trip e-mail exchanges in order to support certain inflated marks in the ABN1 book

d.   SERAGELDIN and his co-conspirators used interstate and foreign wires in furtherance of the objects of the conspiracy.

## Overt Acts

44.   In furtherance of said conspiracy and to effect the illegal objects thereof, KAREEM SERAGELDIN, the defendant,

Salmaan Siddiqui, David Higgs, and their co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

    a.    On or about August 29, 2007, Siddiqui sent an e-mail from New York, New York to Florida.

    b.    On or about September 13, 2007, SERAGELDIN, who was in New York, New York, had a telephone conversation with CC-2, who was in London.

    c.    On or about November 28, 2007, SERAGELDIN, who was in New York, New York, had a telephone conversation with Higgs, who was in London, United Kingdom.

    d.    On or about December 1, 2007, SERAGELDIN sent an e-mail to a member of CS's RMM department.

    e.    On or about December 3, 2007, Siddiqui sent an e-mail to SERAGELDIN, Higgs and CC-1.

    f.    On or about December 7, 2007, SERAGELDIN sent an e-mail to CS's Chief Risk Officer in New York, New York.

    (Title 18, United States Code, Section 371.)

## COUNT TWO
### (False Books and Records)

The Grand Jury further charges:

45.   The allegations contained in paragraphs 1 through 39, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

46.   From at least in or about August 2007, through and including in or about February 2008, in the Southern District of New York and elsewhere, KAREEM SERAGELDIN, the defendant, and others known and unknown, willfully and knowingly, did, directly and indirectly, falsify and cause to be falsified books, records, and accounts subject to Section 13(b)(2) of the Exchange Act, namely books, records, and accounts of Credit Suisse, an issuer with a class of securities registered pursuant to the Exchange Act, which Credit Suisse Group was required to make and keep in reasonable detail, accurately and fairly reflecting the transactions and dispositions of the assets of Credit Suisse, to wit, SERAGELDIN falsified and directed others to falsify marks in the ABN1 book in order to conceal losses and achieve particular P&L targets.

(Title 15, United States Code, Sections 78m(b)(2)(A),
78m(b)(5) and 78ff, and Title 17,
Code of Federal Regulations, Section 240.13b2-1)

## COUNT THREE
### (Wire Fraud)

The Grand Jury further charges:

47.  The allegations contained in paragraphs 1 through 39, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

48.  From at least in or about August 2007, through and including in or about February 2008, in the Southern District of New York and elsewhere, KAREEM SERAGELDIN, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, for example, a telephone conversation on or about November 28, 2007 between London and New York, for the purpose of executing such scheme and artifice, to wit, SERAGELDIN's efforts to fraudulently inflate the cash bond prices in the ABN1 book.

(Title 18, United States Code, Sections 1343 and 2.)

24

## FORFEITURE ALLEGATION

49.   As a result of committing one or more of the foregoing offenses, in violation of Title 18, United States Code, Sections 1343 and 371, as alleged in Counts One and Three of this Indictment, KAREEM SERAGELDIN, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of these offenses, including but not limited to a sum of money representing the total approximate amount paid by CS to SERAGELDIN during the time he committed, and as a result of his commission of, the foregoing offenses.

(Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461.)

## Substitute Asset Provision

50.   If any of the forfeitable property described in this Indictment, as a result of any act or omission of the defendant:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third person;

c.   has been placed beyond the jurisdiction of the Court;

25

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

    (Title 18, United States Code, Sections 371, 1343 and 981; Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461.)

_____
Foreperson

_____
PREET BHARARA
United States Attorney

26

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

KAREEM SERAGELDIN,

**Defendant.**

### INDICTMENT

12 Cr.

(Title 18, United States Code,
Sections 371, 1343 and 2; Title 15,
United States Code, Sections
78m(b)(2)(A),
78m(b)(5) and 78ff, and Title 17,
Code of Federal Regulations, Section
240.13b2-1.)

PREET BHARARA
United States Attorney.