UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                               :

UNITED STATES OF AMERICA,            :

                               :

       -against-               :   Case No. 12-CR-00090 AKH

                               :

KAREEM SERAGELDIN,            :   ECF Case

                               :

                               :

     *Defendant.*             :

                               :

-----------------------------------------------------------X

 

**DEFENDANT KAREEM SERAGELDIN'S SENTENCING MEMORANDUM**

 

KOBRE & KIM LLP

800 Third Avenue
New York, New York 10022
Tel:  +1 212 488 1200
Fax:  +1 212 488 1220

*Counsel for Kareem Serageldin*

### TABLE OF CONTENTS

I.    **Preliminary Statement** .................................................................................. 1

II.  **Mr. Serageldin's Background** ...................................................................... 5

    A.  **Early Background** ............................................................................... 5

    B.  **College Years** ..................................................................................... 7

    C.  **Career at Credit Suisse** ...................................................................... 9

    D.  **Private Life** ....................................................................................... 11

    E.  **Compensation Regime at Credit Suisse** ......................................... 14

    F.  **The Pricing Crisis During the Market Crash** ................................ 16

    G.  **Responsibilities in 2007** .................................................................. 18

    H.  **Track Record of Taking a Long Term View for the Bank** ............ 19

    I.  **The ABN1 Book and the Mismarking Conduct** ............................ 20

III. **Guidelines Calculation** ............................................................................. 23

IV. **18 U.S.C. § 3553 Suggests a Sentence Substantially Below the Guidelines Range** ...................................................................................... 24

    A.  **Mr. Serageldin Accepted Responsibility to a Greater Degree than the Typical Defendant** ...................................... 26

    B.  **The Applicable Guideline Overstates the Appropriate Punishment** ..................................................................................... 27

    C.  **Under 18 U.S.C. § 3553(a)(1), Mr. Serageldin's Character and History Support a Sentence Far Below the Guidelines** ............ 31

        *Mr. Serageldin Has Lived a Commendable Life* ............................ 31

        *Mr. Serageldin Possesses a Deeply-Felt Sense of Responsibility to Others* ....................................................... 32

        *Family* ............................................................................................. 34

        *Mr. Serageldin Will Rebuild a Productive, Meaningful Life* ........ 36

    D.  **Mr. Serageldin Has Already Been Enormously Punished for his Conduct** ................................................................................. 37

**E.   A Far-Below-Guidelines Sentence Will Sufficiently Promote Respect for the Law and Deter Criminal Conduct** .................................................. 39

**F.   A Far-Below-Guidelines Sentence Will Avoid Unwarranted Sentencing Disparities** ................................................................. 40

*Mr. Serageldin Should Be Compared to the Pool of People that Participated in Similar Conduct* ...................................................... 40

*Any Incarceration Would Have an Amplified and Outsize Effect on Mr. Serageldin* ............................................................................ 42

*Other Relevant Sentences Dictate a Lenient Punishment for Mr. Serageldin* .................................................................................... 44

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Gall v. United States*, 552 U.S. 38 (2007) ........................................................... 25, 27

*Kimbrough v. United States*, 552 U.S. 85 (2007) .............................................. 24, 25

*Nelson v. United States*, 555 U.S. 350 (2009) ........................................................ 25

*Rita v. United States,* 551 U.S. 338 (2007) ........................................................ 24-25

*United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006) ................................. 25-26, 28, 40

*United States v. Anderson*, 533 F.3d 623 (8th Cir. 2008) ........................................ 38

*United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005) .............................................. 25

*United States v. Gaind*, 829 F.Supp. 669 (S.D.N.Y. 1993) ...................................... 40

*United States v. Greene*, 249 F.Supp.2d 262 (S.D.N.Y. 2003) ................................ 34

*United States v. Gupta*, 904 F.Supp.2d 349 (S.D.N.Y. 2012) ................................. 25

*United States v. Harding*, No. 05 Cr. 1285-02 (RWS), 2006 WL 2850261,
(S.D.N.Y. Sept. 28, 2006) ......................................................................................... 34-35

*United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) ............................................... 32

*United States v. Kurland*, 718 F.Supp.2d 316 (S.D.N.Y. 2010) .............................. 30

*United States v. Orosco*, No. 05-CR-892-01 (DLI), 2006 WL 5043025,
(Aug. 10, 2006, E.D.N.Y.) ......................................................................................... 43

*United States v. Ovid*, No. 09 CR 216 (JG), 2010 WL 3940724,
(E.D.N.Y. Oct. 1, 2010) ............................................................................................. 37

*United States v. Pacheco-Soto*, 386 F.Supp.2d 1198 (D.N.M. 2005) ....................... 43

*United States v. Parris*, 573 F.Supp.2d 744 (E.D.N.Y. 2008) ................................. 28

*United States v. Preacely*, 628 F.3d 72 (2d Cir. 2010) ............................................. 31

*United States v. Restrepo*, 999 F.2d 640 (2d Cir.) .................................................... 43

*United States v. Reynolds*, 171 F.Supp.2d 157 (S.D.N.Y. 2001) .............................. 25

*United States v. Sachakov*, No. 11 CR 120 (JBW), 2013 WL 101287,
(E.D.N.Y. Jan. 8, 2013) ............................................................................................. 37-38

**Cases**             **Page(s)**

*United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994)................................................... 43

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ...................................... 27, 28, 37

*United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) ............................................ 34

*United States v. Wills*, 476 F.3d 103 (2d Cir. 2007) ................................................ 40

*United States v. Wong*, 40 F.3d 1347 (2d Cir. 1994) ................................................ 36

**Statutes**

18 U.S.C. § 3553.................................................... 2, 4, 24, 25, 26, 27, 29, 31, 36, 37, 39, 40, 42

18 U.S.C. § 371............................................................................................. 1, 24

U.S.S.G. § 2B1.1............................................. 23, 24, 25, 27, 28, 29, 45

U.S.S.G. § 3B1.1............................................................................................... 24

U.S.S.G. § 3E1.1............................................................................................ 24, 26

**Other Authorities**

Ben S. Bernanke, Chairman, Fed. Reserve Bank, The Housing Market and Subprime Lending,
(Jun. 5, 2007) (transcript available  at:
http://www.federalreserve.gov/newsevents/speech/bernanke20070605a.htm. ........................ 16

Fair Value Measurements, Statement of Fin. Accounting Standards No. 157 (as amended) (Fin.
Accounting Standard Br. 2006), available at http://www.fasb.org/pdf/aop_FAS157.pdf........ 21

Jenny Anderson and Landon Thomas Jr., *Merrill Lynch Reports $7.9 Billion Write-Down*, New
York Times, October 24, 2007 ............................................................................... 41

Larry Cordell, Yilin Huang, Meredith William, Working Paper No. 11-30/R, "Collateral
Damage: Sizing and Assessing the Subprime CDO Crisis," Research Department, Federal
Reserve Bank of Philadelphia, May 2012.........................................................40-41

Mark Landler, *I.M.F. Puts Bank Losses from Global Financial Crisis at $4.1 Trillion*, N.Y.
Times, April 21, 2009 ...................................................................................... 16

Peter Eavis, *Merrill's $3.4 billion balance sheet bomb: In three short weeks, the Wall Street
giant's losses grew from $4.5 billion to nearly $8 billion*, Fortune, Oct. 24, 2007 (available at
http://money.cnn.com/2007/10/24/news/companies/merrill_eavis.fortune/) .......................... 41

iv

**Other Authorities**                                                                                                    **Page(s)**

The Extradition Act 2003, ch. 41, §§ 9-21, 26-34 (2003) (U.K.) ................................................. 27

Tr. of Sentencing Hr'g, *United States v Argo*,

Case No. 07 Cr. 683 (JSR) (S.D.N.Y. 2008) ....................................................42, 44-45

Tr. of Sentencing Hr'g, *United States v. Ferguson,*

Case No. 06 Cr. 137 (CFD) (Dec. 16, 2008) ............................................... 30, 34, 44

Tr. of Sentencing Hr'g, *United States v. Ghavami*,

Case No. 10 Cr. 1217 (KMW) (July 24, 2013)....................................................... 43, 44

Tr. of Sentencing Hr'g, *United States v. Holzer*,

Case No. 09 Cr. 470 (VM) (Sept. 29, 2009)...................................................29, 30, 31-32

Tr. of Sentencing Hr'g, *United States v. Karatz*,

Case No. 09 Cr. 203 (ODW) (C.D. Cal. 2010) ............................................... 45

Tr. of Sentencing Hr'g, *United States v. Livesay*,

Case No. 03 Cr. 182 (KOB) (N.D. Al. 2010) ............................................... 45

Tr. of Sentencing Hr'g, *United States v. Moffat*,

Case No. 10 Cr. 270 (VM) (Sept. 13, 2010)...................................................29-30

Tr. of Sentencing Hr'g, *United States v. Peterson*,

Case No. 11 Cr. 665 (RPP) (Oct. 11, 2011)............................................... 34

Tr. of Sentencing Hr'g, *United States v. Reyes*,

Case No. 06 Cr. 556 (CRB) (N.D. Cal 2010) ............................................... 45

*United States v. Bowers*, Case No. 09 Cr. 496

(GBD) (S.D.N.Y. 2009)................................................................. 30

Kareem Serageldin respectfully submits this memorandum for the Court's consideration in determining a just sentence.

## I.      Preliminary Statement

On April 12, 2013, Mr. Serageldin pled guilty to conspiracy to falsify books and records in violation of 18 U.S.C. § 371.   Long before he entered his guilty plea, Mr. Serageldin began accepting responsibility for this serious but brief and unusual departure from an otherwise law-abiding life.  During the multiple years of the Government's investigation, Mr. Serageldin spent much of his time addressing the Government's questions voluntarily.  Indeed, once charged in this matter, Mr. Serageldin ultimately saved the Government a drawn-out international proceeding by not contesting his extradition. Instead, he came to the United States to accept responsibility for his actions.

As a result of the events in this case, Mr. Serageldin has already (1) through pending settlement with the U.S. Securities and Exchange Commission been effectively banned from a career to which he had devoted his entire adult life; (2) surrendered without litigation approximately US $25,600,000 in compensation back to Credit Suisse (approximately $20,000,000 of which had been earned in years prior to the actions at issue in this case) and agreed to forfeit an additional US $1,003,368.61 to the Government; and (3) been gravely shamed by the seemingly limitless publicity generated in his home city of London and now in the U.S. while his life has been placed on hold for the past five years.  The additional potential cost of accepting responsibility for his crime, as calculated in the draft Pre-Sentence Report ("PSR") and the plea agreement, is a U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 57-60 months of incarceration and a fine range of US $10,000 to US $100,000.

With that background and in light of the factors enumerated in 18 U.S.C. § 3553(a), we respectfully request that the Court consider sentencing Mr. Serageldin far below the sentence indicated by the Guidelines. Based upon a detailed examination of Mr. Serageldin as a person, the circumstances of his offense, and his conduct following his eventual Indictment, we submit respectfully that a sentence far below the Guidelines, combined with the punishment already levied against him, forms a just sentence.  The basis for our request is as follows:

*First*, Mr. Serageldin's conduct consisted of a series of poor judgments in a difficult situation—not the kind of premeditated theft for personal gain that comprises the overwhelming bulk of white collar crimes.  As the Court evaluates the nature and circumstances of the offense, it is critically important to understand the context in which Mr. Serageldin was working in the fourth quarter of 2007 and his motivations for joining an already-ongoing conspiracy. When Mr. Serageldin joined the pre-existing conspiracy to mismark certain positions in the Credit Suisse trading book, the financial markets were experiencing an historic credit crisis.  The epicenter of the crisis, which claimed venerable firms like Bear Stearns and Lehman Brothers and brought the world economy to the brink of failure, was the very trading market Mr. Serageldin had to operate in on a daily basis.

When he discovered that his subordinates had been engaging in serious misconduct by mismarking a trading book, Mr. Serageldin was afraid that the misconduct would result in serious damage to his established reputation at the bank, especially with the new head of the division that had started just a few months earlier.  Rather than owning up to this failure within his business and damaging the reputation he spent his entire career building, regrettably, Mr. Serageldin—in a terrible error in judgment—joined those subordinates and continued the crime.

The circumstances of 2007 are not cited to excuse Mr. Serageldin's obviously wrong decisions because there were alternative lawful courses of action open to him for dealing with the conspiracy he discovered. We submit, however, that viewing this conduct against the financial crisis backdrop is essential to understanding that the behavior in question was not a premeditated effort to secure additional financial benefit, but rather a series of poor decisions made as the credit markets crumbled around him.

*Second*, as discussed and acknowledged at his change of plea hearing, Mr. Serageldin never intended to increase his own compensation with the mismarking. The Indictment's allegation that compensation was his motivator is at odds with several important facts. For one, the allegations of the Indictment are isolated to relatively small adjustments to a subset of the bonds in "ABN1," a single trading book under Mr. Serageldin's vast expanse of responsibilities. The bonds in question comprised a small segment of his overall management responsibility—all told, Mr. Serageldin oversaw approximately US $15 billion of similar long positions and US $12 billion of similar short positions as well as additional tens of billions of long positions and short positions across other asset classes. Given Mr. Serageldin's expansive financial management responsibilities, he had numerous options at his disposal to generate substantially more legal "P&L" if that were his goal. Further, given his demonstrated value and history of generating massive profits for the bank, he could have simply requested higher pay. In the attached letter, Mr. Serageldin's former supervisor David Thomson explains:

> Kareem never appeared to be driven by personal compensation. He was very highly compensated for all the years he reported to me (as we all were), but I never got the sense this drove him. He never discussed his bonus with me (as opposed to many traders who will lobby overtly or covertly around bonus time every year). He never flirted with moving firms (a typical strategy bankers use to establish a "bid away" or a "floor" for their bonus). He simply said "thank you"

> every year after I informed him of his bonus. The only exception was that he would sometimes volunteer to reduce his own bonus to "top up" someone reporting to him who he felt may have been granted too small a bonus. This behavior is very rare.  (Ex. S, Letter of David Thompson, at 2).

Thus, in assessing the nature of the crime committed and whether the Guidelines gain/loss calculation is an appropriate measure of Mr. Serageldin's culpability, we ask the Court to consider that because Mr. Serageldin's actions were not influenced by a financial gain that could be measured with a Guidelines matrix, the sentence recommended by that matrix deserves less weight than the other factors enumerated in 18 U.S.C § 3553(a).

*Finally*, as many courts have observed, the principal focus in a sentencing proceeding should not be on the crime, but rather on the individual person who stands before the Court to receive his sentence.  Here, then, we ask the Court to take into account the commendable manner in which Mr. Serageldin has lived his 40 years.  He leads a private life focused on family and friends.  He is charitable with money, but more importantly, he has shared his minimal free time and his analytic training by advising friends and colleagues on complicated business, career and life decisions.  His unassuming good works have included tutoring a young child on her math skills, supporting a domestic worker after she was mugged on the streets of London, and spending hours teaching a recent graduate how to secure employment, rather than using his substantial connections to just get the graduate a job.  In these acts, and the many others detailed in numerous letters submitted on Mr. Serageldin's behalf, Mr. Serageldin has demonstrated generosity that extends beyond financial support to the more enduring gifts of knowledge, confidence and self-achievement.  In judging Mr. Serageldin as a person at this most important moment of his life, we urge the Court to focus on his humility and generosity, which are the foundations of his character.

In sum, we ask the Court to consider Mr. Serageldin's character; the manner in which he accepted responsibility; and the nature and context of the crime that he committed in determining a just punishment that will promote the various ends of sentencing.

## II.     Mr. Serageldin's Background

### A.  Early Background

Mr. Serageldin was born in Cairo, Egypt, and spent his first years there under the care of his grandparents, particularly his grandmother, while his parents completed graduate school in London.  Upon finishing their degrees, Mr. Serageldin's parents decided to move the family, now also including Mr. Serageldin's four-month-old brother, to the U.S. Mr. Serageldin was seven years old at the time. The Serageldins initially settled in Houghton, Michigan, where Mr. Serageldin's father taught engineering at a technical college and his mother taught French and Arabic in the local public school system.

This relocation from Cairo, Egypt to a small, remote town in the Upper Peninsula of Michigan was a complete break from everything Mr. Serageldin had known, and the move was also accompanied by a painful separation from his grandmother, who was and still remains a mother-like figure to him.  Nevertheless, Mr. Serageldin took steps from the beginning to help his family transition to a new life and assumed, with commitment, one of his most important roles, that of a protective big brother.  As Ramy, Mr. Serageldin's younger brother, describes "My brother . . . showed his kindness to me from the beginning. He learned the hard way what my parents could not teach us - what was important for us to assimilate to the culture here." (*See* Ex. C, Letter of Ramy Serageldin, at 1-2).  Mr. Serageldin's mother describes this protective nature when she recounts how Mr. Serageldin, at the age of 10, ████████████████████

████████████████████████████████████

██████████████████████████

Mr. Serageldin was also eager to take on other responsibilities to help his parents.  At the age of 12, Mr. Serageldin enjoyed spending time with his father by accompanying him on the weekends to his office at Michigan Technological University.  It was during these times that his father first witnessed in Mr. Serageldin the signs of talent and a deep interest in the disciplines of science and mathematics.  Mr. Serageldin's father recalls instilling the principles of accuracy and diligence in his son, who would on occasion "run checks on calculations that I had already checked related to my research projects.  I explained that this was necessary to catch errors. I was pleased to see that, unlike some college students I've seen, he understood the importance of not cutting corners and reporting results of experiments objectively without 'bias.'" (*See* Ex. B, Letter of Mohamed Serageldin, at 2).

Mr. Serageldin, having skipped second grade, was younger than his classmates and also smaller physically. As his mother recalls, in an attempt to not "add to [his family's] worries" Mr. Serageldin hid the fact that he was bullied in school, instead focusing intensely on his schoolwork, and making the most of the opportunities for his educational development by entering math contests and challenging himself in the classroom. (*See* Ex. A, Letter of Samia Serageldin, at 2).  Now, his mother reflects on this as an early example of her son "[k]eeping his troubles to himself and trying to spare others [which] is Kareem all over, as a child and an adult." (*See id.).*

Mr. Serageldin worked very hard to succeed at everything he tried (*See* Ex. B, Letter of Mohamed Serageldin, at 2).  In middle school, Mr. Serageldin competed in the Olympics of the Mind competitions and studied advanced math.  After Mr. Serageldin's father lost his job in

Michigan the family moved first to Needham, Massachusetts and then Winston-Salem, North Carolina, where Mr. Serageldin completed his senior year at his third public high school in 3 years.  With exhaustive practice, Mr. Serageldin continued to hone his math skills, and by the end of his sophomore year, had exhausted all of the high school's calculus offerings, completing Advanced Placement Calculus.  At 16, during his senior year, and as soon as Mr. Serageldin was old enough to drive to Wake Forest University, he began taking college-level courses and was able to continue his math studies.

When Mr. Serageldin was only a junior in high school he was offered a scholarship to Princeton University, which he deferred at his parents' urging because he was already a year younger than his class year and also still very small for his age.  The next year he was accepted at and chose to attend Yale University — the culmination of years of dedication and hard work, as well as seeming validation of his parents' decision to move to U.S.

### B.  College Years

At Yale, Mr. Serageldin continued his record of academic achievement, while also finding "the camaraderie and the lifelong friendships he had always sought," particularly with his crew team members, a new sport to Mr. Serageldin.  (*See* Ex. A, Letter of Samia Serageldin, at 3).

Academically, Mr. Serageldin pursued his degree in Mechanical Engineering with the same focus and work ethic he demonstrated during his youth.  However, as Mr. Serageldin's college roommate explains, while "Kareem worked very hard at everything he did . . . his focus and hard work on his studies, coupled with his natural intelligence and aptitude, resulted in outstanding grades," nonetheless "[d]espite the emphasis amongst Yale students on grades, and

intra-class competition . . . Kareem went out of his way to help his classmates . . . often spending several hours with a single individual . . . [h]is objective [ ] to help the person truly understand and master the subject matter" rather than "simply providing answers." (*See* Ex. M, Letter of Alexander C. Magary, at 2).

Mr. Serageldin's caring nature, as well as his focus and dedication, was also evident in his athletic career at Yale.  Benjamin Ryan, a former crew teammate and a Navy SEAL officer, recounts that his "most lasting memory" of Mr. Serageldin occurred at the culmination of their rowing careers:

> Our collegiate rowing careers ended on very different notes. Kareem's boat won the Eastern Sprints, the championship race that caps Yale's racing year. My boat fell short. It might seem silly to somebody who hasn't rowed, but as rowers we threw everything we had over the course of a year into a performance that was measured in that single six-minute race each June. It really felt like it meant everything. At the end of the racing, my boatmates and I were crushed and dejected. Kareem's boat pulled into the dock as champions, and his boatmates were ecstatic and celebrating. But instead of staying and celebrating his greatest athletic moment, Kareem sought out me and several of my boatmates, and spent the remainder of the afternoon consoling and reminiscing with us, and helping us cope with our disappointment. He was focused not on his own success, but on helping his friends who were down. (*See* Ex. L, Letter of Benjamin R. Ryan, at 1).

Mr. Serageldin graduated *magna cum laude* from Yale University with a Mechanical Engineering degree and was recipient of the department's highest honor.  As Mr. Serageldin approached his graduation in 1994, he was accepted to multiple Ph.D. programs in engineering, and was planning to attend Stanford University on a full fellowship.  That was, until Mr. Serageldin received an unsolicited call from what was then CS First Boston, apparently triggered by a tip from one of Mr. Serageldin's professors acting as a talent spotter for the bank.  Mr. Serageldin accepted the interview offer, merely excited for the opportunity to travel to New York City.  However, after the interview, Mr. Serageldin decided that working for a year would

provide him the opportunity to decrease some of his college debt before graduate school. As Mr. Serageldin's father recounts, the ability to be "financially independent as soon as he could after graduation, in order not to add to the family burden" was a significant factor in his decision. (*See* Ex. B, Letter of Mohamed Serageldin, at 3). And so, Mr. Serageldin deferred his prospective studies at Stanford University and became a Technical Associate in CS First Boston's Information Services Department on July 11, 1994.

### C.  Career at Credit Suisse

In his initial back-office role at Credit Suisse, Mr. Serageldin worked with large processing computers writing and maintaining programs that formed part of the bank's nightly cycle to reconcile its financial positions. In a second, similar role he analyzed data sent by the bank's customers to facilitate transactions. As his former colleague (first his supervisor, later his subordinate) writes:

> Kareem was a new technical associate who analyzed computer tapes, sent by bank and finance company clients, holding descriptive data on their consumer loans. Kareem quickly stood out as being particularly bright and hardworking and trustworthy. I was always struck by how many clients went out of their way to praise him for his diligence and conscientiousness. (*See* Ex. D, Letter of Fiachra O'Driscoll, at 1).

Word of Mr. Serageldin's abilities quickly spread and after a year he moved out of that technical role into assisting with the execution of client mandates. He later spearheaded a series of front office transactions designed to reduce the bank's exposure to losses from defaults in its portfolio of corporate bank loans. In 1998, Mr. Serageldin was asked to move to London to continue this type of work. His team grew from only a few employees to over 70 by 2007.

The work ethic and talent that Mr. Serageldin displayed during his youth and in college transferred naturally to his work environment and fueled his fast rise through the bank. From his

first days there, Mr. Serageldin worked the incredibly long hours for which he later became famous for among his colleagues. Mr. Thompson, Mr. Serageldin's former supervisor, observed: "Kareem was the hardest working person I know from my 25 years in finance. His depth and breadth of skills was unique, and I know of nobody else with whom I would have been comfortable running the businesses he did."  (*See* Ex. S, Letter of David Thompson, at 2).

One of Mr. Serageldin's former direct reports writes of his first meeting with Mr. Serageldin in 2001: "I was struck by his fierce intellect, his incredible grasp of various aspects of financial markets (from trading to structuring to legal aspects) and also his approach towards his work (a strong sense of responsibility for his work and his team)." (*See* Ex. Q, Letter of Vaibhav Piplapure, at 1).

Despite the success that Mr. Serageldin achieved through all this hard work, he maintained a humble and quiet nature.  One of his friends, Alastair Balfour, observed that Mr. Serageldin was always quiet about his professional success and frequently demurred when asked about his job, and notes: "[h]e has taught me humility – he is blessed with enormous intelligence and capacity for problem solving but in all the years I have known Kareem I have never heard him talk down to someone or try to advertise his intelligence." (*See* Ex. R, Letter of Alastair Balfour, at 3).

While he moved rapidly from the back office to trader to supervisor, Mr. Serageldin demonstrated continued devotion to his colleagues.  As Mr. Piplapure remembers:

> In my experience, this devotion towards his job and his determination to succeed did not come at the expense of his commitment to his team. I remember one incident in particular in the early years of me knowing him. I was working on a transaction that had a deadline that happened to coincide with my birthday. I had not mentioned to any of my colleagues that it was my birthday. Kareem overheard me cancelling a birthday dinner certain friends had organised for me that evening. Late that night, after the documentation for the transaction was finalised, Kareem asked if he could buy me dinner on my way home. He

invited a few other colleagues as well. Half way through dinner, a birthday cake appeared. It was a wonderful gesture, which helped me appreciate how Kareem went out of his way to recognise the human element in a professional setting. (*See* Ex. Q, Letter of Vaibhav Piplapure, at 2).

As far outside the norm as Mr. Serageldin's abilities proved, his lifestyle and motivations were even rarer.  He was driven by the desire to excel that was grounded on substantive performance of his business, rather than the number on his bonus check, and his ambitions focused on a long-term career, rather than short-term wealth maximization.

Mr. Serageldin proved this aspect of his character again and again.   (*See* Ex. S, Letter of David Thompson, at 1, 2). As Mr. O'Driscoll relays, once, when Mr. Serageldin learned that one of his team members had received an unfairly small bonus:

> Kareem went to the divisional compensation team and agreed to increase the young man's bonus largely out of Kareem's pocket.  For bureaucratic reasons, this involved Kareem getting a pay cut that was three times the increase in the team member's bonus, but the young man was happy and remained with Credit Suisse long after Kareem was gone. (*See* Ex. D, Letter of Fiachra O'Driscoll, at 6).

Numerous letters of support also confirm that Mr. Serageldin was never preoccupied by the prospect of maximizing his bonus, or by any of the perks greater pay could have brought him. He "seemed to derive the greatest pleasure from getting this architecture and these details [of the transactions he worked on for the bank] right . . . and not [from] the accumulation or application of any personal wealth." (*See* Ex. O, Letter of Edmond Curtin, at 2).

### D.  Private Life

Despite the financial success Mr. Serageldin experienced over his time at the bank, he was not one to put his wealth on display, instead valuing "utility over superficial appearance." (*See* Ex. N, Letter of Marcus Brands, at 3).  For seven years (even after being promoted to Managing Director) Mr. Serageldin lived in a modest, one-bedroom apartment that faced the

train platforms of Victoria Station, gravitating towards a lifestyle of practicality, conveniently near multiple forms of public transportation, rather than the trappings of the luxury apartment he could have afforded. This lifestyle of simplicity and practicality extended beyond his choice of residence. As Mr. Brands further explains, "he does not own an expensive watch (in fact he does not wear a watch at all, preferring to keep time using the clock on his cell phone) . . . [m]aterialistic goods simply do not interest him and in this respect he often stood out in an environment where opulence was frequently the norm." (*See* Ex. N, Letter of Marcus Brands, at 3).

In 2005, Mr. Serageldin became godfather to a long-time friend's daughter, and then to the other two children in the family as well. As the children's mother explains, "he has taken his role extremely seriously to the point where . . . [he has] developed his own unique relationship with each child and treats them all with enormous love, devotion and generosity with his time and emotion." (*See* Ex. G, Letter of Samira Beavis, at 2). Mr. Serageldin is a constant in the children's everyday lives, whether he is tutoring one of the children in math, taking them out for pizza or ice cream, or simply staying in contact with them, listening to their "childish chatter" or "delighting in their tales" or providing them with advice through text-messages. (*See id.*). Mr. Serageldin's friends have taken notice of how important the children are to him. As Maxwell T. Mulligan, a friend, explains "[i]t is when you see the effect Kareem has on these three little girls . . . that you realize what it is about this man that makes him who he is . . . he is the center of their universe when in the same room." (*See* Ex. V, Letter of Maxwell T. Mulligan, at 2).

Mr. Serageldin's long-time partner, Karima, is of paramount importance to him. They have been together for thirteen years. As Karima writes of their relationship:

12

> Kareem is my partner, my love, my best friend, my confidant, and the person I can
> always rely on. He is my biggest supporter, as I am his. Over the years we have built a
> trusting, tender and committed foundation to our relationship, shared a full life together,
> supported one another in good times and bad. . . . He makes me laugh, holds my hand
> when I cry, and seeks to protect me (as he does his family and friends) from life's
> offensives. It is a rare and wonderful feeling to know that if I ever need anything Kareem
> is always there for me. In short, as our friends often remark, we are inseparable [.] (*See*
> Letter of Karima ███████████████████

As many of Mr. Serageldin's friends attest, Karima is the "center of his life" and he is very supportive and proud of her achievements.  (*See* Ex. M, Letter of Alexander C. Magary, at 4 and Ex. HH, Letter of Elizabeth Deeming, at 1).  As Karima herself explains, "Kareem, like me, was anglicised. So in many ways due to our Anglo-cultural upbringing I was intrigued by our similarities as much as our diversities . . . . [h]e has a deep-rooted loyalty and unwavering fidelity to his friends, and to his work, and to his family." (*See* Letter of Karima ██████████ ███████████████████  Though Mr. Serageldin has delayed proposing over the past several years because of his current circumstances, he considers her his wife in all but name. Karima agrees, and has often noted: "I do not need a piece of paper, a ring and a party to legitimise our relationship." (*See Id.*, at 1).

Aside from Karima, the person to whom Mr. Serageldin is most devoted is his grandmother.  She is now eighty-five years old and living in Cairo, Egypt.  As Mr. Serageldin's uncle explains, Mr. Serageldin "grew, and still is, extremely attached to her . . . . [t]he same is true on her side; he is by far her favorite, and after my father's death he was her raison d'être and filled her whole life" and "when he is around her mood is so high, that she becomes a very different person[.]" (*See* Ex. E, Letter of Amr Serag-Eldin, at 2).  Despite Mr. Serageldin's intense work schedule, he without fail made the trip to Cairo to visit his grandmother at least once every year and more frequently when possible.  He has also been known to surprise her on

many occasions, once even "sleeping on the porch so as not to startle her in the middle of the night" after arriving late in the evening.  (*See* Ex. F, Letter of Aleya Serageldin, at 3-4).  These visits always resulted in great happiness for his grandmother, where she would "look years younger, almost child-like, bright-eyed, delighted, challenged to do more and feeling spoiled all the time by his attention."  (*See id., at 4*).  In addition to experiencing the difficult repercussions of his conduct, Mr. Serageldin has been living with the emotional pain and guilt of knowing that he may not be able to bring the joy he once did to his grandmother during his surprise visits and may possibly never see her again.  (*See* Ex. A, Letter of Samia Serageldin, at 6).

As Mr. Serageldin's mother poignantly observed "[i]n a way Kareem remained, all his life, the boy who tried so very hard to get things right. Also the boy who felt he had to work harder than most to be accepted by his peers, and who racked up awards and badges as personal proofs of self-worth then stowed them away in boxes rather than displaying them. (*See id.*, at 2).

### E.  Compensation Regime at Credit Suisse

Mr. Serageldin was well-compensated during his tenure at Credit Suisse.  Typical of most industry professionals, he received a standard base salary, a larger cash bonus, and the majority of his compensation over the past few years came in the form of an annual bonus of deferred compensation.   For front-office personnel, including Mr. Serageldin, a key metric used to measure an individual's performance was profit and loss or "P&L."  (*See* Ex. P, Letter of James P. Healy, former Head of the Fixed Income Division at Credit Suisse, at 4).  P&L is a number approximating how much revenue the employee has generated for the bank in a given year.  A final overriding factor in the determination of individual compensation is the relative compensation of peers across the industry.

For a desk trader, P&L was tied to the trading positions initiated.  The same is true for a trading desk manager, like David Higgs, only his P&L would be based on all trading books he supervised.  For a more senior manager, such as Mr. Serageldin in 2007, his P&L included all profit earned across the numerous trading books, business lines and other revenue generating enterprises that he supervised as well as his contribution to the firm in other ways (e.g. special projects).

For a desk trader, there would be a strong link between P&L and bonus.  For an employee at Mr. Serageldin's seniority level, the relationship between P&L and bonus was increasingly scaled down over the years, because Mr. Serageldin's P&L was drawn from various lines of revenue and enormous—approximately US $1.278 billion of P&L in 2007.  Similarly, the bank made adjustments to bonuses to smooth out the effect of big (or small) P&L years to prevent compensation from soaring (or plummeting) from year to year. (*See* Ex. P, Letter of James P. Healy, at 5). As such, over the years Mr. Serageldin's bonus did not increase in proportion with his P&L, but flattened out as his responsibilities grew by orders of magnitude. For example, Mr. Serageldin's 2006 P&L was approximately US $376 million, and his 2006 bonus was US $6.5 million, while his 2007 P&L was approximately US $902 million higher (or 3.4 times as great) but his bonus that year increased by 8% to US $7 million.[1]

The vast majority of his compensation in 2007 came in the form of deferred compensation, because Credit Suisse placed a cap on the amount of cash bonus it would pay.[2] The deferred compensation vested over a period of years, meaning, Credit Suisse retained the

---

[1] In addition, a significant part of Mr. Serageldin's compensation for 2007 was in recognition of saving Credit Suisse from incurring between US $2 and US $3 billion in losses by his decision to liquidate certain positions (the so-called "CDO warehouses") he inherited shortly after the reorganization in January 2007.

[2] Due to the structure of Credit Suisse's bonus deferral, the cash portion of Mr. Serageldin's bonus for 2007 would have been exactly the same whether his bonus award was increased by any amount or reduced by $3 million.

potential ability under certain circumstances to seize the deferred compensation if an employee left the bank or was terminated before the end of the vesting period.[3]

### F.  The Pricing Crisis During the Market Crash

Starting in 2007, after several prosperous years, the U.S. financial markets, particularly the credit markets, hit a wall.  The real estate bubble fueled by rampant consumer lending and poor underwriting standards collided with rising interest rates.  One of the centerpieces of the crisis was the Residential Mortgage Backed Securities ("RMBS") market.  The credit crisis began in February 2007 when the price of subordinate tranches of many such RMBS suddenly collapsed when the transactions began to experience high delinquency and loss rates as the residential real estate market came crashing down and mortgage lending tightened.  By the end of 2007, the sickness spread upward to the AAA-rated tranches, something previously thought impossible.

The credit markets at this time became deeply chaotic, and participants were forced to make decisions regarding huge quantities of assets based on imperfect information.  Miscalculations were not limited to banks.  Federal Reserve Chairman Ben Bernanke famously predicted in June 2007 that "the troubles in the subprime sector seem unlikely to seriously spill over to the broader economy or the financial system."[4]  Such predictions proved to be incorrect. For example, the IMF projected total credit crisis losses to reach US $4.1 trillion. *See* Mark Landler, *I.M.F. Puts Bank Losses from Global Financial Crisis at $4.1 Trillion*, N.Y. Times, April 21, 2009, at A6.

---

[3] Credit Suisse took back Mr. Serageldin's deferred compensation of $25.6 million pursuant to this regime.
[4] Ben S. Bernanke, Chairman, Fed. Reserve Bank, The Housing Market and Subprime Lending, (Jun. 5, 2007) (transcript available  at: http://www.federalreserve.gov/newsevents/speech/bernanke20070605a.htm).

During this time market liquidity evaporated as trading dried up and participants were forced to extrapolate from very limited information. This was not a scenario predicted or planned for by the markets.  In contrast to establishing a valuation for a common stock where the price is known because it is displayed on an exchange, a buyer of a US $100 RMBS bond might have been willing to pay only US $40 and the seller might have been willing to sell at no less than US $80, resulting in a spread between the buyer's price and the seller's price (referred to as a "bid-offer" spread) of US $40 (or "40 points") versus just a penny for a typical stock.  Valuing or marking RMBS became a considerable challenge.  This situation was summarized well by Credit Suisse's CEO on a conference call that occurred on 20 March 2008 in commenting on the securities involved in this case.  He stated that:

> [T]hese markets in particular through the end of the year [2007] and into the first quarter [of 2008] have been extremely volatile. They're also extremely illiquid and so with some of these securities . . . [b]ut some of these securities can see 40 point bid offer spreads. So in these kinds of market conditions with these kinds of illiquid securities it's, obviously, it's a very challenging environment.

The CEO of Credit Suisse's Investment Bank also noted during the conference call that "with the illiquidity in the market, you just don't have that much visibility because you don't see that many trades moving to the market to redirect and confirm pricing, and so that really makes it more challenging."

In the end, IndyMac, Fannie Mae, Freddie Mac, Lehman Brothers, Merrill Lynch, AIG, Washington Mutual and Wachovia would either fail or be taken over.  In addition, AIG would have to be rescued by the Federal Reserve.  In many instances, the businesses that suffered the largest losses at these institutions during this time corresponded to the businesses under Mr. Serageldin's responsibility at Credit Suisse after he was promoted in early 2007.

### G. Responsibilities in 2007

In February 2007, at the age of 33, Mr. Serageldin was promoted to Global Head of Structured Credit.  He was one of the youngest to supervise a business of that size and complexity in the bank's history.  He was the manager of a highly complex sub-business for the bank, reporting to a revolving group of supervisors, including the Global Co-Heads of Structured Products, Andrew Kimura and Michael Marriott.  Mr. Serageldin also reported to three other individuals for certain other purposes.  Messrs. Kimura and Marriott in turn reported to Michael Ryan, the Global Head of Securities, who reported to the CEO of the Investment Bank and ultimately to Credit Suisse CEO, Brady Dougan.

In his new position, Mr. Serageldin had to split his time among seemingly countless responsibilities, overseeing eight separate business areas, including:  (i) hedge trading (which included ABN1), (ii) correlation trading, (iii) European/Asia "new issue" structuring, (iv) Americas "new issue" structuring, (v) ABS credit and CDO secondary trading, (vi) CDO syndicate and warehousing, (vii) counterparty credit risk management, and (viii) a number of smaller teams that undertook varied activities.  He supervised more than 70 people, in New York, London, and across Asia.  He traveled constantly back and forth between London and New York as well as to Asia and the Middle East.  In terms of financial measurements, Mr. Serageldin's total responsibilities likely exceeded over $50 billion gross across long positions and short positions combined.[5]

Because Mr. Serageldin's businesses were numerous and varied, eight managing directors and one director reported directly to Mr. Serageldin, and each one in turn managed his

---

[5] To provide the Court with a first-hand account of Mr. Serageldin's responsibilities in 2007, we asked his former Credit Suisse colleague to provide a summary.  His letter is attached as Ex. D, Letter of Fiachra O'Driscoll.

own team.  A significant amount of the responsibility for running each of the businesses was shouldered by managers reporting to Mr. Serageldin and by their respective subordinates.[6]  In addition to overseeing the above-described activities, Mr. Serageldin would also spend substantial time on activities such as meeting with his supervisors, sales and marketing personnel, clients, and overseeing many special projects.

### H.  Track Record of Taking a Long Term View for the Bank

Mr. Serageldin had an established track record of taking a long-term view of his career and doing what was right for the long-term interests of Credit Suisse even when it was not in his own short-term self-interest.  He elected to forgo business that would have (legally) generated hundreds of millions in short-term profits for his P&L.  He rejected these opportunities because he took the view that certain short-term profits came with unacceptable long-term risks that exposed the bank to outsized losses years in the future.  Examples of these decisions include:  (i) not executing rent-a-manager CDO transactions such as the notorious Abacus 2007-AC1 CDO (*See* Ex. E, Letter of Fiachra O'Driscoll, at 5); (ii) not taking on super senior risk and buying protection on it from insurance companies (*See* Ex. S, Letter of David Thompson, at 2-3); (iii) liquidating the CDO warehouses (*See* Ex. W, Letter of Manuel de Souza-Girão, at 2); and (iv) not offering the single-tranche CDO product (*See* Ex. P, Letter of James P. Healy, at 1-2), amongst others.

---

[6] For example, a desk head, like Mr. Higgs, would run all aspects of his respective desk, including: supervising traders, reviewing positions, going through the P&L process, reviewing risk reports, hiring and firing people, and promotions. While, to use the same example, Mr. Higgs was a direct report to Mr. Serageldin, Salmaan Siddiqui and the other co-conspirators managing ABN1, reported to Mr. Higgs.

In fact, during the very period at issue here, Mr. O'Driscoll describes how Mr. Serageldin could have "appropriately recognized almost $100 million in added revenues" on "three large transactions, totaling almost $7 billion" executed during late 2007. (*See* Ex. D, Letter of Fiachra T. O'Driscoll, at 6). Mr. Serageldin took the above decisions notwithstanding that they were not popular internally—because not all of his colleagues were as resistant to risky short-term profits as he was—and therefore exposed him personally to career risk such as delayed or denied promotions.

### I.   The ABN1 Book and the Mismarking Conduct

ABN1 was a hedged book, meaning the long positions in RMBS were offset fully or at least partially by corresponding short positions on the same or similar bonds. The mismarked bonds that are the subject of the Indictment were all contained in a single trading book known as ABN1, which held a collection of RMBS of various vintages, maturities, and coupons as well as approximately $1.6 billion of positions in other asset classes.  For reference, ABN1 was one of over 25 trading books contained in the businesses which Mr. Serageldin supervised.

Mr. Higgs was the day-to-day manager and bore responsibility for the operation of ABN1.  Mr. Serageldin had supervisory oversight over Mr. Higgs.  As the fourth quarter of 2007 started, Mr. Serageldin did not know about the conspiracy to mismark positions in ABN1.  He came to learn more as the quarter progressed.

As was common in industry practice, Mr. Serageldin on occasion was consulted by Mr. Higgs regarding the need to make minor adjustments (positive and negative) to the daily marks and P&L results of some positions by making certain changes in line with what they believed to be appropriate given market movements that day.  At the start of the quarter, this guidance was

within what Mr. Serageldin believed to be an acceptable range, even when he selected the high, low, or middle of the range.

When marking-to-market complex securities (like RMBS), many traders, due to inherent uncertainty in valuation and the lack of observable prices (such as on an exchange), were forced to exercise significant judgment.  It was widely known and accepted that the fair value of a complex security could fall within a certain justifiable range based on various indicators.  *See, e.g.* Fair Value Measurements, Statement of Fin. Accounting Standards No. 157 (as amended) (Fin. Accounting Standard Br. 2006), available at http://www.fasb.org/pdf/aop_FAS157.pdf. FASB defined fair value as "the price that would be received to sell an asset . . . in an orderly transaction between market participants." *Id.* at ¶ 5. It was recognized that "selection of where within the range" requires judgment, considering both "qualitative and quantitative" factors. *Id.* at ¶ 18(a).  Mr. Serageldin's crime occurred when certain marks were made outside the acceptable range.

As discussed during his plea proceeding in answering a question from the Court, Mr. Serageldin's entered the conspiracy when he reviewed a report that indicated that a subset of the AAA bonds in ABN1 were marked outside any acceptable range.  At this point, Mr. Serageldin had knowledge of wrongdoing being committed by his subordinates and the authority and obligation to order that the marks be remarked within an acceptable range.  The violation was knowingly conspiring to mismark certain long RMBS positions in ABN1.

Mr. Serageldin was assured by Mr. Higgs that the mismarked long positions were significantly hedged, and consequently any P&L effect the mismarks might have on ABN1 would be greatly reduced. This was because for a significant amount of the long positions that were marked too high, Mr. Serageldin was under the impression that each was substantially

hedged by a corresponding short position moving in step with the long mark.  Such a hedge should have negated a large portion of any P&L effect, though Mr. Serageldin's conduct would still have been unlawful.

A key example of Mr. Serageldin being informed of the mismarks as well as the hedge structure occurred on January 4, 2008, when he was assured by Mr. Higgs that the bonds were heavily hedged. During a January 4, 2008 telephone call, Mr. Higgs led Mr. Serageldin to believe that a "good chunk" or close to 80% (or specifically, US $438 million out of US $560 million) was hedged.  (*See* January 4, 2008 Transcript, CS – T16075 at 2:8-16).

Mr. Serageldin had an additional independently verified basis to trust that the ABN1 hedge structure was in operation and marked accurately at the bottom line (*i.e.* would not generate unjustified P&L).  On or about December 7, 2007, Mr. Serageldin's superiors asked him to undertake an exercise that would verify the pricing of all of Mr. Serageldin's RMBS positions (including the ABN1 positions at issue in this case) by hypothetically remarking each position (longs and hedges) to the level of the corresponding ABX index.  This analysis was prepared for Credit Suisse's banking regulator, the Swiss Federal Banking Commission, or "EBK."

Mr. Serageldin agreed to have someone on his team perform the analysis on the condition it be verified by an independent compliance function.  This exercise, known as the "EBK Exercise," was completed on or around December 15, 2007 and, as requested by Mr. Serageldin, was independently verified by both Product Control (which is the compliance function responsible for monthly Price Testing) and Risk Measurement and Management.  The result showed that if all AAA positions supervised by Mr. Higgs were remarked to the level of the

ABX, the aggregate P&L impact would be only US $37 million, or 0.7% of the market value of ABN1—well within the bid-offer spread for the bonds at this time.

The EBK Exercise was widely distributed within the senior management of both the front office and back office of Credit Suisse.  The report in particular gave Mr. Serageldin confidence that the aggregate valuation of his positions was not inflated as it showed that if all positions (longs and shorts) across all of Mr. Serageldin's books were benchmarked against the ABX, the marks were actually conservative (by over US $396 million).  This meant that if marked in that manner his books would have generated an additional US $396 million of P&L.

Nonetheless, before the end of 2007, Mr. Serageldin did in fact have full knowledge that his subordinates were inflating the value of certain long positions held in the ABN1 book.  With that knowledge he permitted the mismarking to occur, and caused additional mismarks to occur to create the false impression that this book was in order, notwithstanding the chaotic market conditions.  On February 12, 2008, a few hours after Credit Suisse announced its 2007 results, Mr. Serageldin received an email from one of his bosses containing a list of 20 potentially mismarked bonds that were under review, which was expanded to a full review of ABN1 by the end of the day.  Mr. Serageldin was suspended on February 17, 2008.

III.     Guidelines Calculation

As part of his April 12, 2013 plea agreement with the Government, Mr. Serageldin stipulated to the applicable offense level of 25 and corresponding Guidelines range of 57-60 months.

Under the applicable Guideline, U.S.S.G. § 2B1.1(a)(2), the base offense level is six.  Mr. Serageldin and the Government stipulated to a total gain figure based on the compensation

received by four of the five (including Mr. Serageldin) co-conspirators, totaling US $1.7 million for Mr. Serageldin, US $1.6 million for Mr. Higgs, US $930,625 for Salmaan Siddiqui, and US $250,000 for an unnamed co-conspirator.  Because that figure falls between US $2,500,000 and US $7,000,000, U.S.S.G. § 2B1.1(b)(1)(J) prescribes an 18-level enhancement.  The additional co-conspirator whose compensation was not included in the PSR calculation may have moved abroad before any charges were filed in this matter.

Mr. Serageldin and the Government have further stipulated to a four-level role enhancement under U.S.S.G. § 3B1.1(a), and a three-level reduction—acknowledging the timeliness of Mr. Serageldin's notice to the Government that he intended to enter a guilty plea— for his acceptance of responsibility under U.S.S.G. § 3E1.1 (a)-(b).

As Mr. Serageldin has never before broken the law, his criminal history category is I, and his total offense level of 25, taking into account the 60-month statutory maximum under 18 U.S.C. § 371, corresponds to a suggested Guidelines range of 57-60 months.

## IV.    18 U.S.C. § 3553 Suggests a Sentence Substantially Below the Guidelines Range

Calculation of an appropriate sentence is governed by 18 U.S.C. § 3553(a).  We respectfully submit that upon consideration of the required factors, only a sentence far below the stipulated Guidelines range can meet the requisite standard of punishment "sufficient, but not greater than necessary" to meet the ends of justice.  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

As the Court is aware, the Guidelines are "truly advisory" and the Court has wide latitude to determine that they "should not apply, perhaps . . . because the Guidelines sentence itself fails to properly reflect § 3553(a) considerations, or perhaps because the case warrants a different

24

sentence regardless." *Rita v. United States,* 551 U.S. 338, 367 (2007); *United States v. Crosby*, 397 F.3d 103, 103 (2d Cir. 2005); *Kimbrough*, 552 U.S. at 113 (Scalia, J., concurring in the judgment).  The Guidelines may not be presumed to be reasonable.  *Gall v. United States*, 552 U.S. 38, 39 (2007); *Nelson v. United States*, 555 U.S. 350, 351-52 (2009).[7]  Instead the Guidelines must "take second place to section 3553(a), which requires a court to take account of a defendant's character in imposing sentence." *United States v. Gupta*, 904 F.Supp.2d 349, 354 (S.D.N.Y. 2012).  As one pre-*Booker* opinion put it,

> The Sentencing Guidelines, in presenting grids for calculating punishment, are not intended to transform the judge into an adding machine. It is an individual who is being sentenced . . . The sentence . . . must take into account all components of justice, reflecting the Sentencing Guidelines, the government's arguments and claims, and the particular considerations of the human being . . . the crime he committed, his role in the community and his force for good, his history and prospects, and the like.

*United States v. Reynolds*, 171 F.Supp.2d 157, 160 (S.D.N.Y. 2001) (*rev'd* on grounds abrogated by *Booker*).  Because Section 2B1.1 attempts to replace the holistic assessment of wrongfulness compelled by 18 U.S.C. § 3553(a) with a quantitative measure driven by the amount of money implicated (in any of a variety of ways), it can create an "utter travesty of justice" because of its

---

[7]  That Section states in relevant part: The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant . . .
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines. . .
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

"fetish with abstract arithmetic." *United States v. Adelson*, 441 F.Supp.2d 506, 512 (S.D.N.Y. 2006).  In *Adelson*, the court went on to observe the "harm that [2B1.1] guideline calculations can visit on human beings if not cabined by common sense." *Id.*

Sections 3553(a)(1), (a)(2), and (a)(6) all support a below-Guidelines sentence for Mr. Serageldin.

### A. Mr. Serageldin Accepted Responsibility to a Greater Degree than the Typical Defendant

Every defendant has a range of lawful options open to him or her when charged—to plead guilty, go to trial, or to negotiate any of the possible variations on those courses. Defendants investigated while abroad have a longer list of lawful options: they are under no duty, until charged, to respond to or remain within the reach of the Government.  Mr. Serageldin, though, chose to take responsibility for his crime.

Like all defendants who receive a three-level reduction in their Guidelines range under U.S.S.G. § 3E1.1, Mr. Serageldin saved the Government and the Court substantial effort that a trial would have otherwise entailed.  But his conduct in this manner is considerably beyond that norm.  He remained in contact with the Government while it investigated him.[8]  He remained in London during that time within the Government's potential reach while he had other lawful

---

[8] He also initially remained in close contact with Credit Suisse.  The bank first identified potential mismarks of bonds held in the ABN1 book on February 12, 2008.  That same day, Mr. Serageldin began working with bank managers and traders to help identify proper valuations for the bonds at issue, and he continued to assist over the course of the next two days in London—despite the presence of the bank's outside counsel and Mr. Serageldin's own lack of representation.  On the 15th, a Friday, he flew to New York at the bank's request to further assist the investigation.  Despite obvious indications that he was in personal jeopardy, including having his firm cell phone and e-mail access disabled as he arrived in New York and losing unescorted access to bank facilities, Mr. Serageldin proceeded to the bank's offices and worked through the night and over the weekend to help determine the correct marks for the positions that had aroused concern.  He also met extensively with the bank's New York outside counsel. Only after having been suspended did Mr. Serageldin retain his own counsel.

options.   After indictment, he maintained his cooperative stance and promptly informed the Government that he would return to face the charges against him and not contest extradition.[9] Within days of being indicted, Mr. Serageldin engaged new counsel for the purpose of arranging a plea agreement with the Justice Department.   He returned as promised.   Furthermore, he has proactively sought out resolution of his parallel case with the SEC and that matter has been resolved pending Commission approval.   Yet despite distinguishing himself from most other defendants, he is still awarded the same three point reduction as all others by the Guidelines' uniform approach to acceptance of responsibility.   Mr. Serageldin has acted in a more responsive and upright manner compared with many similarly-situated defendants, but the Guidelines fail to capture the extent to which Mr. Serageldin's responded directly to the charges against him.

### B.  The Applicable Guideline Overstates the Appropriate Punishment

While the stipulated Guidelines range correctly calculates the Sentencing Commission's recommendation in this case, that range significantly overstates the appropriate punishment, and should be given minimal weight under  18 U.S.C. § 3553(a)(2)(A).  *See United States v. Stewart*, 590 F.3d 93, 141-42 (2d Cir. 2009) (Noting that a "mathematical approach" to weighing the various 18 U.S.C. § 3553(a) factors "has been expressly disavowed by the Supreme Court as a classic example of attempting to measure an inventory of apples by counting oranges.") (quoting *Gall*, 552 U.S. at 596, internal quotations omitted).   Because there is no logical connection between a dollar-driven Guidelines calculation and Mr. Serageldin's non-financially-motivated conduct, any dollar-driven calculation under 2B1.1 is an inaccurate measure of his crime.

---

[9] In not contesting extradition, Mr. Serageldin declined the various procedural safeguards that might have significantly delayed his return, including waiving the hearing, review under the U.K. Extradition Act and U.K. Human Rights Act (implementing the European Convention on Human Rights), and right of appeal provided under U.K. law.  The Extradition Act 2003, ch. 41, §§ 9-21, 26-34 (2003) (U.K.)

The key assumptions underlying Section 2B1.1 calculations are not implicated in this matter. The "gain" amount was neither the purpose nor the intended effect of the crime, and overstates the seriousness of the wrongdoing. We urge the Court to consider that, as one Judge commented, although the Guidelines (indirectly) reflect congressional judgment about national policy, "this does not mean that the Sentencing Guidelines for white-collar crimes should be a black stain on common sense." *United States v. Parris*, 573 F.Supp.2d 744, 754 (E.D.N.Y. 2008). *See also Adelson*, 441 F.Supp.2d at 512.

Mr. Serageldin did not commit the crime at issue here to obtain money or property, or to cause a loss to his employer. His conduct was motivated by a foolish and ill-conceived effort to preserve the image that mistakes did not happen in his business. As the Second Circuit has held, "[i]n evaluating culpability, we cannot discount the relevance of the defendant's motivations." *United States v. Stewart*, 590 F.3d 93, 140 (2d Cir. 2009).

The bonds at issue constituted only a small fraction of the over US $50 billion in gross positions that Mr. Serageldin supervised, and he did not believe that inflating their value would materially increase his P&L numbers for the year. In addition, at Mr. Serageldin's position, he was well aware that bonuses were compressed such that even substantial improvements in P&L might not bring any material compensation gains.

The fact that Mr. Serageldin believed that the mismarked positions were hedged further underscores his lack of any intent to profit. For any given mismark entered on the books to overstate the value of a long position, Mr. Serageldin believed that a corresponding change in the mark of the short position (the hedge) would substantially reduce the economic effect of the long mismark—in other words, there would be little net benefit to Mr. Serageldin's P&L.

Finally, as described above and in the letters attached to this memorandum, Mr. Serageldin was not driven by the pursuit of monetary gains.  As his former colleague Mr. Piplapure described, "During my entire time working with Kareem, he never struck me as someone motivated by monetary gains for himself or material possessions."  (Ex. Q, Letter of Vaibhav Piplapure, at 3).  Had increasing compensation been a goal of Mr. Serageldin's, he could have easily seized one of the many opportunities to generate additional P&L that he had during the period of the conduct at issue.  As Mr. Healy, Mr. Serageldin's former supervisor observed with respect to one of those opportunities, "[i]t took courage and personal conviction, in the face of immense pressure and resentment from the sales force and their management, not to follow the crowd.  I respected him for it and it was a vivid example of how he sacrificed short-term P&L in order to have a stronger business for Credit Suisse over time." (*See* Ex. P, Letter of James P. Healy, at 2).

The more just and logical measure of an appropriate sentence is instead one driven by the holistic criteria of 18 U.S.C. § 3553(a).  *See, e.g.* Tr. of Sentencing Hr'g at 16:22-17:6, 18:19-24, *United States v. Holzer*, Case No. 09 Cr. 470 (VM) (Sept. 29, 2009), Ex. OO.  Such a measure leads to a significantly shorter sentence than the one calculated under 2B1.1, because the other 18 U.S.C. § 3553(a) factors all favor a far below-guidelines sentence.

Other courts confronted with a financial crime not driven by greed have recognized that motive is an important sentencing consideration.  *United States v. Moffat* was an insider trading case where the tipping I.B.M. executive did not attempt to earn any illicit profit from the information he passed to those who traded on it.  The tipper, Moffat, received less than a quarter of the punishment of two individuals who most directly traded on the information, his paramour Danielle Chiesi (30 months incarceration) and her boss Mark Kurland (27 months). *See* Tr. of

29

Sentencing Hr'g at 24:22-25:3, *United States v. Moffat*, Case No. 10 Cr. 270 (VM) (Sept. 13, 2010), Ex. PP. As Judge Marrero explained in sentencing Kurland to vastly more time than Moffat would eventually receive (and based upon the Judge's knowledge that Moffat had entered into a plea agreement with the Government that provided a Guidelines range of 0 to 6 months), "Mr. Moffat, though he breached his duty to his employer, did not provide information in exchange for money, and did not stand to make any monetary gains from his transgression." *United States v. Kurland*, 718 F.Supp.2d 316, 321 (S.D.N.Y. 2010).

Similarly, in *United States v. Ferguson*, the defendant, the CEO of General Reinsurance Corp. was sentenced to two years' imprisonment and two years' supervised release against a Guidelines sentence of life imprisonment for his role in orchestrating a sham transaction with AIG.  During the sentencing hearing, the court called special attention to the fact that "there was no motivation of direct personal profit" for the defendant, "unlike so many other recent stock market fraud cases." Tr. of Sentencing Hr'g at 103:1-3, *United States v. Ferguson,* Case No. 06 Cr. 137 (CFD) (Dec. 16, 2008), Ex. QQ. Additionally, in *United States v. Holzer*, Judge Marrero contrasted Holzer, who traded on inside information, with another defendant in the related case, *United States v. Bowers*, Case No. 09 Cr. 496 (GBD), who had not traded on inside information, in explaining why he was giving Holzer a harsher punishment than Bowers (9 months in halfway house and 5 years probation as opposed to Bowers' 2000 hours of community service and 3 years probation). Tr. of Sentencing Hr'g at 17:22-18:24, *United States v. Holzer*, Case No. 09 Cr. 470 (VM) (Sept. 29, 2009), Ex. OO.

### C.  Under 18 U.S.C. § 3553(a)(1), Mr. Serageldin's Character and History Support a Sentence Far Below the Guidelines

Under the 18 U.S.C. § 3553(a) framework, an appropriately fashioned sentence should incorporate the "history and characteristics of the defendant."  *United States v. Preacely*, 628 F.3d 72, 84 (2d Cir. 2010) (Lynch, J., concurring); *see also* 18 U.S.C. § 3553(a)(1).   Mr. Serageldin's history and characteristics are not adequately accounted for by a Guidelines sentence in this case.  He has lived a commendable life but for the conduct that brought him before the Court.  He has consistently demonstrated a genuine sense of care for others and a willingness to give fully of himself to effectively support those in need.  He has been and will remain an important supporting force to Karima and his family.  Finally, Mr. Serageldin has amply demonstrated that he will rebuild a productive life for himself once he has received his punishment and moved on from this case.

*Mr. Serageldin Has Lived a Commendable Life*

The supporters who submitted letters to the Court have shown his to be a good, decent life that bears no relation to Mr. Serageldin's conduct at the tail end of 2007.  As demonstrated by the letters, shortcuts are antithetical to Mr. Serageldin's character.  Since youth, he has built his life, his career, and his entire self-image on near-constant, exceedingly hard work, combined with a generous spirit.  Collectively, the letter writers demonstrate that his conduct at the end of 2007 was a true aberration—a sharp, short break from everything before and everything after.

Where a defendant demonstrates that his criminal act was an unusual deviation from the whole remainder of his life, under 18 U.S.C. § 3553(a), courts are entitled to impose sentences far below the Guidelines range.  For example, in *United States v. Holzer*, the court sentenced the defendant to nine months in a halfway house, where the Guidelines called for 12 to 18 months

incarceration, in part because he credited the Probation Department's finding that the defendant was "a good person who made a terrible mistake." Tr. of Sentencing Hr'g at 16:22-19:10, *United States v. Holzer*, Case No. 09 Cr. 470 (VM) (Sept. 29, 2009), Ex. OO.  Similarly, in *United States v. Howe*, the court affirmed a sentence of three month's home confinement and probation, where the Guidelines called for 18 to 24 months incarceration, because defendant made an "isolated mistake" in an otherwise outstanding life.  *United States v. Howe*, 543 F.3d 128, 132 (3d Cir. 2008).

*Mr. Serageldin Possesses a Deeply-Felt Sense of Responsibility to Others*

Mr. Serageldin's defining trait is his commitment to those who need him.  As the examples cited show, he did not let running a business on three continents prevent him from being present when it counted.  Mr. Serageldin has traveled on moments' notice to friends in need.  He has befriended and watched over those less fortunate than himself like his assaulted housekeeper, left work for a week to care for a sick uncle, researched medical data unsolicited for a friend that had just received a difficult medical diagnosis, and has given countless hours of his time using his gift for teaching difficult concepts, especially in math and economics, to fellow classmates, his godchildren, friends and colleagues.   As Mr. Neves writes while recounting Mr. Serageldin's efforts to help his wife (Mr. Serageldin's housekeeper) after she was assaulted: Mr. Serageldin is "always offering his willingness to help in whatever way that would be necessary. He made gestures of great humility and appreciation."   (*See* Ex. K, Letter of Nelson Neves, at 2).

Mr. Serageldin helps in the way that is most meaningful and helpful, and best preserves the dignity, of the person reaching out to him.  Usually that entails giving away that commodity

he has least of—his time away from work.  It is telling that when Alastair Balfour was seeking a job at Credit Suisse which Mr. Serageldin could have obtained for him with a telephone call, Mr. Serageldin instead expended "countless hours" helping Mr. Balfour prepare to earn his own way—leaving a friend with confidence and personal satisfaction.  (*See* Ex. R, Letter of Alastair Balfour, at 1-2).

Helping in this manner often requires sustained efforts:  Mr. Serageldin makes repeated and continuing commitments to those who need him, and lets them know they can count on him for as long as they require.  As Alex Magary recalls, Mr. Serageldin would "often spend[] several hours with a single individual . . . [to] teach the individual the relevant concepts and principles, rather than simply providing answers . . . [even where they] had brought their difficulties on themselves by skipping class or not studying enough."  (*See* Ex. M, Letter of Alexander C. Magary, at 2).  He has demonstrated himself not just a person who shows up to help, but one who stays as long as he is needed.  As one writer put it, "He is the friend you always want by your side when things get tough and you need to understand how to get through them."  (*See* Ex. J, Letter of Daniele Benatoff, at 2).  Despite all this assistance, though, Mr. Serageldin always makes sure to give credit to the person he helps, as Dr. Batt described:

> For weeks, Kareem tutored me. He never asked anything in return but took great pride in my mastery of the material. When I finally received top marks for the course, Kareem was overjoyed and demanded a celebration. He refused to take credit for his diligent and patient tutelage, repeatedly turning the attention to my efforts. (*See* Ex. U, Letter of Katharine Batt, at 1).

In addition, as discussed by Mr. Serageldin's long-time partner, Karima, Mr. Serageldin's "altruism extends to people he knows less well or even strangers he interacts with[.]"  This includes contributions to a charity for the disabled which donates wheelchairs to those in need, a cause that Mr. Serageldin took "to heart right away" and for which "his substantial contributions

were counted on by the charity year after year."   (*See* Letter of Karima ███████████

████████████

This unique characteristic merits consideration of a far below-Guidelines sentence.  *See, e.g.* Tr. of Sentencing Hr'g at 19:4-9, 21:7-9, *United States v. Peterson*, Case No. 11 Cr. 665 (RPP) (Oct. 11, 2011), Ex. RR (citing the fact that the defendant was the kind of person "who gave of himself, not just of his wallet" in granting a sentence of three months' home confinement and two years' probation, where the Guidelines called for 12 to 18 months incarceration).  *See also United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming three-month Medicare fraud sentence in part based on defendant's generosity with his time in supporting and aiding others); Tr. of Sentencing Hr'g at 101:18-24, 108: 1-6, *United States v. Ferguson*, Case No. 06 Cr. 137 (CFD) (Dec. 16, 2008), Ex. QQ (citing the fact that defendant had "on many occasions reached out to support people and families facing crises," aiding "not just with financial support, but with his time, kindness and his patience" in granting a sentence of two years' incarceration and two years' supervised release where Guidelines called for life imprisonment); *United States v. Greene*, 249 F.Supp.2d 262, 264-65, 267 (S.D.N.Y. 2003) (pre-Booker, granting seven-level downward departure because defendant gave not just money but significant time in the care of adopted children).

*Family*

Mr. Serageldin is a fixture in his large, loving family—a family that benefits greatly from his kindness and wisdom, and which has pled with the Court for mercy on his behalf.  Mr. Serageldin's role in his family is a well-established basis for a below-Guidelines sentence.  For example, in *United States v. Harding*, the court granted a below-Guidelines sentence because of

the defendant's "significant network [of family and community members] that is ready to support [the defendant]."  *United States v. Harding*, No. 05 Cr. 1285-02 (RWS), 2006 WL 2850261, at *5 (S.D.N.Y. Sept. 28, 2006).

Mr. Serageldin's family will support him once his punishment is complete, and Mr. Serageldin will continue to do even more for them.  His love and care for his grandmother pervades the letters submitted—that he is the kind of person who flies thousands of miles to surprise her, and then sleeps on her porch after arriving late to make sure he does not startle her by knocking on the door in the dark, is telling.   He has shown that he is the person his family can and should turn to both in emergencies like ███████████████ and other serious tragedies such as the death of his aunt Sanaa's father.  As his brother describes, Mr. Serageldin is someone he "rel[ies] on for advice and support to guide me through life."  (*See* Ex. C, Letter of Ramy Serageldin, at 5).  ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ Even now, with his professional life gone and more than five and a half years of uncertainty building to a head, multiple letter writers have noted that Mr. Serageldin appears more concerned about his family than about his own well-being.  As his mother Samia notes, ██████████████████

████████████████████████████████████████████████████

████████████████████████████████ Mr. Serageldin has never stopped trying to

protect them from harm or shield them from the impact of what he is going through in this case. (*See* Ex. A, Letter of Samia Serageldin, at 6)

*Mr. Serageldin Will Rebuild a Productive, Meaningful Life*

A defendant's ability to move past his wrongdoing to rebuild a valuable and meaningful life is central to an assessment of his or her personal characteristics, and thus to an assessment of the proper punishment to impose. *See United States v. Wong*, 40 F.3d 1347, 1382 (2d Cir. 1994) (holding that it is "well established that a district court should consider a defendant's potential for rehabilitation in determining a sentence," citing 18 U.S.C. §§ 3553 (a)(1), (2)(D)). Mr. Serageldin has amply demonstrated that he is capable of leading a good life once his punishment here is complete. As Mr. Serageldin's former colleague Mr. Piplapure writes, after describing Kareem's "seemingly inhuman ability to operate at high levels of productivity for long hours on very little sleep": "Looking to the future, I believe that Kareem has a lot to offer. [Given his] [i]ntellect, devotion to one's task and generosity with one's time . . . I fervently believe that this is a person capable of doing much good and contributing much to many, just as I believe he has in the past." (*See* Ex. Q, Letter of Vaibhav Piplaure at 2-3). Mr. Serageldin's intelligence, insightfulness and incredible work ethic has impressed upon the many supporters who submitted letters to the Court that, with certainty, Mr. Serageldin will make valuable use of his talents. As noted by another former colleague, Tahir Wahid: "[t]he impression that I had of him, which I think is correct, is that he was entirely 'self-made'…Kareem Serageldin is a man who is capable of doing a great deal of good for society. This is due to his uncommon intelligence, his focus, his unusual capacity for hard work, and the leadership qualities that he had displayed in front of me with various individuals." (*See* Ex. Z, Letter of Tahir Wahid, at 2, 3).

Mr. Serageldin has shown in his life before and after his crime that he is a good, reliable, and selfless person who touches the lives of those around him.  Such character can locate the appropriate sentence f below the recommended Guidelines range.  For example, Judge Gleeson wrote in sentencing a defendant under 2B1.1 that while the Guidelines can be useful,

> sentencing judges know that a full consideration of "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), implicates offense and offender characteristics that are too numerous and varied, and occur in too many different combinations, to be captured, much less quantified, in the Commission's Guidelines Manual.  A consideration of those and the other factors set forth in § 3553(a) produces sentences that are moored to fairness, and to the goals of sentencing set forth in § 3553(a)(2), but sometimes not so much to the advisory Guidelines range. Indeed, in some cases the fair sentence can drift quite far away from the advisory range, which is, after all, but one of eight factors the sentencing judge must consider.

*United States v. Ovid*, No. 09 CR 216 (JG), 2010 WL 3940724, at *1 (E.D.N.Y. Oct. 1, 2010) Fairness for a person like Mr. Serageldin calls for such a sentence quite far below the advisory range.

### D.  Mr. Serageldin Has Already Been Severely Punished for his Conduct

Mr. Serageldin has already suffered significantly for his conduct, which factors squarely in an assessment of a "just punishment for the offense" under 18 U.S.C. § 3553 (a)(2)(A).  As the Second Circuit has noted, "[i]t is difficult to see how a court can properly calibrate a just punishment if it does not consider the collateral effects of a particular sentence." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (holding that the District Court properly considered under 18 U.S.C. § 3553(a)(2)(A) that the "conviction itself already visit[ed] substantial punishment" on the defendant by likely barring him from future work in his chosen profession) (quotations omitted).  *See also, e.g. United States v. Sachakov*, No. 11 CR 120 (JBW), 2013 WL 101287, at *3 (E.D.N.Y. Jan. 8, 2013) (fact that defendant was likely to lose medical license

37

when fashioning appropriate sentence); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (court properly considered insider-trader's "atypical punishment such as the loss of [defendant's] reputation" and the "ongoing case against him from the Securities and Exchange Commission").

The career that Mr. Serageldin devoted his life to building is gone.  His hard work and the time sacrificed to build that career have been rendered a waste.  Mr. Serageldin was fired by the bank, and is banned from the financial industry by his new status as a felon.

Mr. Serageldin also surrendered a staggering sum in deferred compensation that he had earned in the period *prior* to his misconduct.  As previously stated, Credit Suisse has already taken back approximately US $25,600,000 from Mr. Serageldin, US $20,000,000 of it earned before the offense.  Such a sum far exceeds any estimate of the harm caused by the charged conduct, and is more than five times greater than even the arbitrary combined-salaries proxy loss used in the 2B1.1 calculation here.

In addition, Mr. Serageldin will forfeit US $1,003,368.61 pursuant to his plea agreement. He has been enjoined by court order in the S.E.C. civil action and will suffer the collateral consequences in any attempts at future business dealings.  He has been hounded by the press, with his picture on the front pages of newspapers in London and New York.  All told, Mr. Serageldin has already been severely punished, and we respectfully request that the Court bear this prior punishment in mind while determining whether and to what extent additional punishment is necessary.

### E.  A Far-Below-Guidelines Sentence Will Sufficiently Promote Respect for the Law and Deter Criminal Conduct

A below-Guidelines sentence for Mr. Serageldin will adequately promote respect for the law and deter criminal conduct under sections 3553(a)(2)(A) and (B), because (i) his broad acceptance of responsibility underscores respect for the law; (ii) his non-financial-motivated white collar offense is exceedingly rare, deterrence should weigh less heavily in the 18 U.S.C. § 3553(a) analysis than it might for a crime that posed a greater public menace; and (iii) any term of imprisonment in this case, not matter how low, will serve as a stark warning to any potential future market participants.

Indeed, as has been observed by former Credit Suisse Managing Director and lawyer Edmond Curtin, with whom Mr. Serageldin spent countless hours and late nights developing legal architecture for complex transactions, Mr. Serageldin had never before shown anything except complete respect for the law.

> Kareem always showed an acute interest in understanding and applying the legal rules to which he, and the business managed by him, were subject. For me, this seemed to reflect not only his scholarly interest in law as a discipline but also a more fundamental respect for the rule of law as such. In finance, and indeed in life generally, there are those who are cavalier about legal rules in the mistaken belief that they are somehow exempt. Kareem is not of this group. (*See* Ex. O, Letter of Edmond Curtin, at 2).

This fundamental part of Mr. Serageldin's belief system has been underscored by his behavior since the Government began its investigation and in his unusually cooperative and full acceptance of responsibility.

Beyond Mr. Serageldin's already-discussed acceptance of responsibility, it is plain that anyone viewing Mr. Serageldin's already-received punishment and future prospects can see the magnitude of loss he has visited on himself.  He has lost his career, staggering funds, and has been vilified by every financial news outlet.  No one viewing his example would find any period

of incarceration Mr. Serageldin may receive to be a tipping-point factor in an analysis of whether or not to engage in similar conduct. Courts have recognized that long prison terms are not necessary to deter white collar criminals. *See, e.g. Adelson*, 441 F.Supp.2d. 506 at 514 (in a securities fraud case, citing research showing that "even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders.").[10]

### F.   A Far-Below-Guidelines Sentence Will Avoid Unwarranted Sentencing Disparities

Under 18 U.S.C. § 3553(a)(6), the Court must avoid unwarranted sentencing disparities "nationwide." *See United States v. Wills*, 476 F.3d 103, 109 (2d Cir. 2007). That requirement urges a lenient sentence for Mr. Serageldin.

*Mr. Serageldin Should Be Compared to the Pool of People that Participated in Similar Conduct*

Structured products (like RMBS and CDOs) were broadly traded prior to the credit crisis of 2007. Across the global financial markets, numerous institutions including Credit Suisse accumulated portfolios of these securities valued in the billions or even tens of billions of dollars, and lost similar sums during the credit crisis. The public record makes plain that Mr. Serageldin was almost certainly not alone in marking positions at inflated values during the financial crisis.

In early 2008, it was estimated that the CDO market had been responsible for losses of "$500 billion on a trillion dollars of issuance". (*See* Larry Cordell, Yilin Huang, Meredith William, Working Paper No. 11-30/R, "Collateral Damage: Sizing and Assessing the Subprime

---

[10] Given Mr. Serageldin's departure from the financial industry and settlement of the related S.E.C. suit, specific deterrence is not an issue here. *See United States v. Gaind*, 829 F.Supp. 669, 671 (S.D.N.Y. 1993).

CDO Crisis," Research Department, Federal Reserve Bank of Philadelphia, May 2012). The losses of one of Credit Suisse's biggest competitors are instructive.

At the beginning of October 2007, Merrill Lynch announced a massive, US $4.5 billion write-down for its third quarter ending September 30th and stemming from CDO and subprime losses. *See, e.g.* Peter Eavis, *Merrill's $3.4 billion balance sheet bomb: In three short weeks, the Wall Street giant's losses grew from $4.5 billion to nearly $8 billion*, Fortune, Oct. 24, 2007 (available at http://money.cnn.com/2007/10/24/news/companies/merrill_eavis.fortune/).

Less than three weeks later, Merrill Lynch announced that it was increasing that write-down by more than fifty percent, to a total US $7.9 billion, for the same reporting date, i.e. the third quarter of 2007. *Id.* Merrill Lynch specifically attributed the increased write-down to "collective review of the troubled securities, which resulted in more conservative valuation assumptions and the larger loss number." *Id.* (internal quotations omitted). The *Fortune* article quoted Merrill CEO Stanley O'Neal on a conference call explaining the new losses:

> Merrill CEO Stanley O'Neal said that over the past few weeks, the brokerage's new head of fixed income, David Sobotka, had been part of "a collective review" of the troubled securities, which resulted in "more conservative valuation assumptions" and the larger loss number. *Id.*

The article went on to caution that "[a]ttempts to contact [Sobotka's predecessor] were unsuccessful at publication time. The market may never hear [Sobotka's predecessor's] view of what happened." *Id. See also* Jenny Anderson and Landon Thomas Jr., *Merrill Lynch Reports $7.9 Billion Write-Down*, New York Times, October 24, 2007.

Despite the enormous US $3.4 billion change in valuation and the roughly three week period from initial announcement until revaluation, in the same kinds of assets at issue here, in the same time period, neither Merrill Lynch, nor any of its officers or employees have been

charged.[11]  This is just a single example of the numerous multi-step or massive write-downs that occurred as financial institutions began to acknowledge the crisis.  We cannot know how many other professionals made the same ill-conceived decisions Mr. Serageldin did, but it is a safe to say that there were more than just him.  When the market conduct in the credit crisis most similar to Mr. Serageldin's own has resulted in not a single other felony conviction—leaving him and his co-conspirators the only convicted defendants in the industry—unwarranted discrepancy has already taken place. *See, e.g.* Tr. of Sentencing Hr'g at 28:8-29:7, *U.S. v. Argo*, Case No. 07 Cr. 683 (JSR) (Jan. 28, 2008), Ex. SS (finding that apparent resolution of similar cases by means short of criminal prosecution was relevant to the unwarranted disparities analysis).

We do not ask the Court to excuse Mr. Serageldin because others almost certainly engaged in similar conduct and remain unbothered by their past sins.  We only ask that when measuring out the fair amount of punishment for his crime, the Court consider such disproportionate justice as a factor under 18 U.S.C. 3553(a).

*Any Incarceration Would Have an Amplified and Outsized Effect on Mr. Serageldin*

As a British citizen, Mr. Serageldin would suffer a more difficult incarceration than would any similarly-situated U.S. citizen if the Court were to sentence him to such a punishment. Although Mr. Serageldin is a first-time offender convicted on a non-violent charge—which would normally result in the Bureau of Prisons assigning him to a camp—Mr. Serageldin will be classified as a deportable alien.  The BOP would therefore automatically raise his security classification and place him in at least a low-security prison facility.  There, he would do significantly harder time than would most white collar defendants, with greater restrictions on his

---

[11] Merrill took another, $11.5 billion writedown in the fourth quarter of 2007.  Merrill Lynch & Co. Inc., Current Report (Form 8-K), Exhibit 99.1 at 2 (filed on Jan. 17, 2008).

movements, closer scrutiny of any visits he receives, more of the indignities that accompany security measures, and a greater risk of violence.

His immigration status also will bar him from serving any portion of an incarceration term in a halfway house, substantially increasing the length of any sentence. *See United States v. Orosco*, No. 05-CR-892-01 (DLI), 2006 WL 5043025 (Aug. 10, 2006, E.D.N.Y.); *United States v. Pacheco-Soto*, 386 F.Supp.2d 1198, 1205 (D.N.M. 2005); *United States v. Smith*, 27 F.3d 649, 655 (D.C. Cir. 1994). The overall effect of Mr. Serageldin's immigration status thus risks being "severe and unfair" as manifested through the BOP's procedures. *Orosco*, 2006 WL 5043025, at *1.

Although a defendant's immigration status is not the basis for a downward departure in the Second Circuit (see *United States v. Restrepo*, 999 F.2d 640, 641 (2d Cir.), cert. denied, 510 U.S. 954 (1993)), the fact that a non-citizen defendant may be treated differently from similarly situated defendants certainly is a consequence that can be "severe and unfair" in the language of *Orosco*. *See United States v. Ghavami* (sentencing defendant to 18 months incarceration, where Guidelines recommended 41 to 51 months, in part because as a Belgian citizen he faced non-camp prison assignment, and deportation upon release, and thus harsher punishment than similarly-situated defendants who are U.S. citizens). Tr. of Sentencing Hr'g at 157:20-24; 158:11-15, *United States v. Ghavami*, Case No. 10 Cr. 1217 (KMW) (July 24, 2013), Ex. TT. This is particularly true for Mr. Serageldin given that his life partner, and almost all members of his close-knit family, reside outside of the United States in Europe and Egypt, thus visitation is exceedingly more difficult, if not impossible.

*Other Relevant Sentences Dictate a Lenient Punishment for Mr. Serageldin*

It is rare for a defendant to plead guilty to a single count of conspiracy to mismark books and records—typically, defendants plead guilty to multiple and/or substantive counts when conspiracy to falsify books and records is charged.  And, as noted above, the fact that Mr. Serageldin and his co-conspirators are the only defendants prosecuted for mismarking stemming from the tumultuous period of the financial crisis means there are no nationwide comparison points.  What reference points exist for violations of the statute in question, show that any significant term of imprisonment would subject Mr. Serageldin to an unwarranted sentencing disparity.  For example:

- *United States v. Ferguson* (D. Conn. 2008).  Defendant was found guilty at a month-long trial of securities fraud, conspiracy, making false statements to the SEC, and mail fraud, and faced a Guideline range recommending a life sentence.  He was sentenced to 24 months in prison and a fine of $200,000.  The Court highlighted the relevance of Mr. Ferguson's lack of financial motivation.  Ferguson, the former CEO of General Reinsurance Corp., orchestrated a sham transaction with AIG that the Court found to cost AIG shareholders nearly US $600,000,000.  The conviction was overturned on appeal, and Mr. Ferguson subsequently was granted a deferred prosecution agreement after agreeing to pay a US $200,000 fine. *See* Tr. of Sentencing Hr'g, *U.S. v. Ferguson*, Case No. 06 Cr. 137 (CFD) (Dec. 16, 2008), Ex. QQ.

- *United States v. Ghavami* (S.D.N.Y. 2013).  Ghavami was the most senior of three municipal bond marketers at UBS convicted at trial of conspiracies to commit wire fraud.  Despite his senior status at his bank, based on his personal characteristics—including among other things (as noted above) the additional hardships he faces as a foreign citizen—the court sentenced him to 18 months against a 41 to 51 month Guidelines range. *See* Tr. of Sentencing Hr'g, *U.S. v. Ghavami*, Case No. 10 Cr. 1217 (KMW) (July 24, 2013), Ex. TT.

- *United States v Argo* (S.D.N.Y. 2008).  Indicted for conspiring to falsify books and records by backdating options, Argo pled guilty to substantive securities fraud.  Facing a Guidelines range of 97 to 121 months' incarceration, she received 6 months in prison, a US $1 million fine, and a recommendation for a federal prison camp.  The Court noted

the disparity between those prosecuted for backdating and the others merely investigated and never charged. *See* Tr. of Sentencing Hr'g, *U.S. v. Argo*, Case No. 07 Cr. 683 (JSR) (Jan. 28, 2008), Ex. SS.

- *United States v. Karatz* (C.D. Cal. 2010).  Karatz was convicted at trial of two counts of mail fraud and two counts of making a false statement in connection with an extensive backdating scheme at KB Home that netted Karatz himself an additional US $6.6 million in ill-gotten compensation.  Though the Government sought a six-year sentence, he was ordered to pay a $1 million fine, serve eight months of home detention, and perform community service.  The Court cited, among other factors, that Mr. Karatz had already been punished by the loss of tens of millions of dollars' worth of vested options. *See* Tr. of Sentencing Hr'g, *U.S. v. Karatz*, Case No. 09 Cr. 203 (ODW) (Nov. 10, 2010), Ex. UU.

- *United States v. Reyes* (N.D. Cal 2010).  Reyes was convicted of nine charges—one count of falsifying books and records, four counts of lying to auditors, and four counts of security fraud—in connection with the Brocade backdating investigation.  Facing a Guidelines range of 24 to 30 months, but with the Government seeking a higher range and a 37-month sentence, Mr. Reyes was sentenced to 18 months' imprisonment and a US $15 million fine.  The Government had estimated the scope of the fraud on the investing public at just shy of US $1 billion, and the Court found that Mr. Reyes obstructed justice. *See* Tr. of Sentencing Hr'g, *U.S. v. Reyes*, Case No. 06 Cr. 556 (CRB) (Jun. 24, 2010), Ex. VV.

- *United States v. Livesay* (N.D. Al. 2010).  Kenneth Livesay pled guilty to a conspiracy to falsify books and records and commit wire and securities fraud, and, as well as aiding and abetting falsification of books and records, for an elaborate scheme by Livesay and other chief officers of HealthSouth to overstate the apparent assets of the company.  He was sentenced on remand after cooperating to 5 months of imprisonment with a strong recommendation for prison camp, a fine of US $10,000, and forfeiture, having faced a 78 to 97 month Guidelines range. *See* Tr. of Sentencing Hr'g, *U.S. v. Livesay*, Case No. 03 Cr. 182 (KOB) (Feb. 16, 2010), Ex. WW.

Unlike these and the vast majority of other defendants sentenced under U.S.S.G. § 2B1.1, Mr. Serageldin never sought to profit from his crime.

*          *          *

Mr. Serageldin has accepted responsibility and has already paid an extremely steep price for his crime.  His acts, though certainly unlawful, were undertaken with no intent to profit or steal.  And his crime was a brief departure from everything he has done before and after the period at the very end of 2007 when the financial crisis engulfed the very markets in which he operated.  We therefore respectfully and humbly request a sentence far below the Guidelines.


October 2, 2013
New York, New York

Respectfully submitted,

KOBRE & KIM LLP


 s/ Sean P. Casey
Sean P. Casey
sean.casey@kobrekim.com

Michael S. Kim
michael.kim@kobrekim.com

Scott K. McCulloch
scott.mcculloch@kobrekim.com

800 Third Avenue
New York, New York 10022
Tel: +1 212 488 1200
Fax: +1 212 488 1220

*Counsel for Kareem Serageldin*