DBMLSERS                    Sentence

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          12 CR 90 (AKH)

5   KAREEM SERAGELDIN,

6              Defendant.

7   ------------------------------x

8                                    New York, N.Y.
                                     November 22, 2013
9                                    11:42 a.m.

10

    Before:
11
                     HON. ALVIN K. HELLERSTEIN,
12
                                          District Judge
13

14                          APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    EUGENE E. INGOGLIA
17       Assistant United States Attorney

18  KOBRE & KIM LLP
         Attorneys for Defendant
19  BY:  SEAN P. CASEY
         MICHAEL S. KIM
20       SCOTT McCULLOCH

21

22

23

24

25

DBMLSERS                    Sentence

1              (Case called)

2              THE COURT:  So you read the presentence investigative

3     report, Mr. Serageldin?

4              THE DEFENDANT:  I have, your Honor.

5              THE COURT:  And discussed it with your counsel?

6              THE DEFENDANT:  I have, your Honor.

7              THE COURT:  Counsel, are there any errors that you

8     wish me to consider for correction?

9              MR. CASEY:  No, your Honor.  Our objections are

10    included in the addendum to the final PSR.

11             THE COURT:  And they've been taken care of?

12             MR. CASEY:  They have, your Honor.

13             THE COURT:  So you're satisfied with the facts as set

14    out in the report?

15             MR. CASEY:  We are, your Honor.

16             THE COURT:  And is the government?

17             MR. INGOGLIA:  We are, Judge.

18             THE COURT:  I find the facts as set out in the

19    investigative report.

20             Mr. Serageldin pleaded before me on April 12, 2013.

21    His plea of guilty contained a discussion of the sentencing

22    guidelines, and I find them to be the same as that which was

23    agreed.

24             The offense is analyzed under Section 2B1.1 with a

25    base level of six.  The extent of loss is considered to be

DBMLSERS                    Sentence

between two and a half million dollars and $7 million, which

yields an upward adjustment of 18.  Mr. Serageldin was the

leader and organizer of more than five people.  Under Section

3B1.1, another four levels are upwardly adjusted.  This makes

the gross offense level to be 28.  Three levels are reduced for

acceptance of responsibility in a timely basis, and the net

offense behavior level is 25.

          Do I have it right, Mr. Ingoglia?

          MR. INGOGLIA:  You do, Judge.

          THE COURT:  Mr. Casey?

          MR. CASEY:  You do, your Honor.  Thank you.

          THE COURT:  Mr. Serageldin has no criminal history

points.

          So under net offense behavior level of 25, criminal

history category I, the range of custodian punishment provided

by the sentencing guidelines is 57 months at the lowest end,

and because the crime is subject to a five-year statutory

maximum, 60 months is the upward end, 57 to 60 months.

          Supervised release is two to three years.

          Do I have that right, Mr. Ingoglia?  I don't have it

in my notes, but I think that's what it is.

          MR. INGOGLIA:  Three years is the maximum.  I believe

that's right, Judge.

          MR. CASEY:  Actually, your Honor, it's one to three

years.

DBMLSERS                    Sentence

1          THE COURT:  One to three years.

2          MR. CASEY:  Yes.

3          THE COURT:  Yes, that's right.

4          MR. CASEY:  The guideline recommendation.

5          THE COURT:  Yes.  So the guidelines speak to a range

6     of custodial punishment of 57 to 60 months' custody, followed

7     by one to three years of supervised release.

8          The guideline range for a fine is from $10,000 to

9     $100,000.  The statutory maximum is $250,000.

10         Is that right?

11         MR. INGOGLIA:  That is right, Judge.

12         THE COURT:  Mr. Casey?

13         MR. CASEY:  Yes, your Honor, that's correct.

14         THE COURT:  Okay.  So Mr. Serageldin committed his

15    crime posted in London for Credit Suisse.  He was the head of a

16    trading department of Credit Suisse and his crime is described

17    in the presentence investigative report and I'm sure we'll be

18    discussing it.

19         Without my further comment, let me turn it over

20    Mr. Casey.

21         MR. KIM:  With your Honor's permission, Mr. Casey and

22    I addressed different points that we want to advance to the

23    Court.

24         THE COURT:  I'll let you both speak.

25         MR. KIM:  Yes.  Thank you.

DBMLSERS                    Sentence

1          THE COURT:  I have a very extensive submission.  But

2     it's my practice, Mr. Kim, to allow counsel to tell me anything

3     that they wish to tell me.  My interest is to make sure that

4     everything that defense counsel and government counsel think I

5     should consider in sentencing is told to me and you're sure

6     that I have grasped it.

7          MR. KIM:  Yes, your Honor.  And I know your Honor's

8     practice is to read all the materials carefully, so I will not

9     repeat.

10         THE COURT:  You can.

11         MR. KIM:  I will try to focus.

12         THE COURT:  Don't feel constrained.

13         MR. KIM:  Yes, your Honor.

14         THE COURT:  Tell me what you want to tell me.

15         MR. KIM:  Your Honor, I think I want to mainly focus

16    my observations on the characteristics of Mr. Serageldin and

17    the context in which the crime occurred because I think they

18    are important factors for the Court's decision process.

19         I think in addition to some of the other points that

20    Mr. Casey will explain to you, I think there are at least two

21    unusual aspects to the case before you in the area of the

22    characteristics of the defendant and the context in which the

23    crime occurred.

24         I think first the context and motivation for the crime

25    and when it occurred and how it occurred, I know your Honor has

DBMLSERS                    Sentence

1    handled a number of different cases coming out of the financial

2    crisis and, over the years, white collar criminal cases.  And

3    at least in my experience the cases involving the mismarking of

4    assets on books follow one of a few different patterns.

5            Sometimes you have a trader who is mounting ever

6    greater losses and in an attempt to cover that up to preserve

7    one's compensation based on the profit loss numbers, and then

8    sometimes to try to advance a picture of profitability, there's

9    mismarking going on at a scale where there's a false picture

10   presented to the supervisors to try to earn money and to try to

11   conceal losses that that trader caused.  And I'm sure your

12   Honor has seen cases that fit into that fact pattern.

13           Sometimes there are cases where the persons on the

14   trading desk try to affect specific positions because it's

15   heavily tied so some big pay-out that they're trying to achieve

16   by virtue of their trading.

17           Now, I think what's a little unusual about this case

18   is that while the actual conduct, the actual physical acts are

19   very similar to those other cases in the sense of positions

20   were mismarked, the context in which it occurred I think really

21   bears note.  You have a person who I think really at the very

22   young age of 33 was given a tremendous amount of responsibility

23   in a very complex organization.  And you also have a person who

24   just -- I'm sure your Honor has looked at Mr. Serageldin's

25   history -- from an immigrant family, who's worked tremendously

DBMLSERS                     Sentence

1    hard to get to where he was at that young age.

2           The unusual aspect is that Mr. Serageldin essentially

3    discovers that mismarking had already been going on.  And the

4    mismarking itself by really I think most reasonable views has

5    no real material effect on Mr. Serageldin's financial fortunes

6    in the bank except --

7           THE COURT:  How do we know that?

8           MR. KIM:  Your Honor, I think the actual scope of

9    Mr. Serageldin's responsibilities as set out in our submission

10   and the way that his compensation was overall calculated means

11   that the primary motivation of Mr. Serageldin here was really a

12   terrible misjudgment to avoid embarrassment.

13          THE COURT:  You know, I've read that.  It's hard to

14   separate the different permutations of hubris.  A person rises

15   to a certain level with certain responsibility and gets certain

16   emoluments from it and there's a mixture of money, pride,

17   ambition, placement in an organization, and so many other

18   different factors, but they all run together.  If you do well,

19   you get paid more.

20          In the business that Mr. Serageldin was in, salary

21   tends to be relatively minor in the range of compensation a

22   person looks for.  Bonus is very important.  Participation in

23   equity is very important.

24          So it's hard for me to accept that Mr. Serageldin did

25   not at least harbor the thought that if he showed a profit,

1    he'd be better able to get a decent bonus -- more than decent,

2    good bonus.

3            MR. KIM:  Your Honor, what I think is the most

4    important point there is the circumstances under which

5    Mr. Serageldin did --

6            THE COURT:  I just add to that, what do we work for,

7    Mr. Kim, you, me, others -- we want to be the best we can be.

8    We want to be the very best we can be in our profession, and we

9    want to do the best job we can for our client.  Are we looking

10   essentially for money?  In a way, yes, but primarily no.  I

11   think if we were paid less, we'd work just as hard and do just

12   as well, and that's proved by all my colleagues on this court.

13           MR. KIM:  Yes, your Honor.

14           THE COURT:  So money is a factor, but, and I think

15   that's what you mean when you say that Mr. Serageldin was not

16   driven by money.  He may have been wanting the money, it may

17   have come with him, but he would probably do the same thing if

18   there were less money.

19           MR. KIM:  Yes, your Honor.  I think in terms of

20   assessing --

21           THE COURT:  Maybe.  Who knows, who knows.

22           MR. KIM:  I think in terms of assessing an

23   individual's character, that is not to say that his conduct is

24   excusable in any way because obviously he's pled guilty to it,

25   and as your Honor can see from our submission, that's not the

DBMLSERS                    Sentence

1    point of our submission.

2            Rather, in assessing a person's character, I think

3    there's a significant difference between a person who is

4    mismarking positions or putting in fraudulent statements

5    because they think it will advantage them and they do so as

6    part of a calculated strategy, whereas here --

7            THE COURT:  Would you mind if I interrupted.

8            MR. KIM:  Yes, your Honor.  It's your courtroom, so

9    you can interrupt me any time you want.

10           THE COURT:  I think it's not only for the point of

11   being a prerogative of the judge -- it may not be, but I do

12   it -- I think you need to know my mind and I read your material

13   so I've given it a lot of thought, a lot of thought.

14           Mr. Serageldin is like you or me, got a family, we do

15   our job.  We do our job as best we can, work very hard.  But

16   there's this essential difference:  He was in a place where

17   there was a climate that made it conducive to what he did.  The

18   bank was, as you call it, mismarking, but showing false profits

19   much more extensively than Mr. Serageldin was doing.

20   Mr. Serageldin's role was a small piece of an overall evil

21   climate within the bank and with many other banks.

22           But I can't get past the point that he was a leader,

23   and when things are run around you, there's no necessity for

24   the leader to follow suit.  Someone has got to stand up for

25   what's right.  And when he doesn't stand up for what's right,

1    when a person doesn't do what's right and starts doing criminal

2    things, he's a criminal.

3         MR. KIM:  Yes, your Honor, and would I not disagree

4    with any of those statements.

5         I think Mr. Serageldin's primary failure here,

6    criminal failure, was not standing up for what was right, even

7    though the conduct obviously lasted just a few months in an

8    otherwise very expansive career.  He had accomplished and done

9    a lot in the short career, and the conduct itself was confined

10   in time.  The nature of that conduct, as your Honor points out,

11   is that he was in a leadership position where he could have

12   stood up and stopped the conduct that was going on and that was

13   wrong.  And I think just --

14        THE COURT:  Maybe not stopped, but at least he didn't

15   have to participate in it.

16        MR. KIM:  Yes, your Honor, I think on both of those

17   counts.

18        And just my simple point on this first area is that

19   while just as wrong, I think where one sees in the factual

20   context for a limited time he failed to stop it and allowed it

21   to go on and essentially functioned as the group leader while

22   it was going on, while it was wrong, it is different and a

23   little bit unusual in character from a lot of the other cases.

24        And I think secondly, your Honor, I think this goes

25   the comments your Honor just made, the amount of punishment

DBMLSERS                         Sentence

1   that has been inflicted on Mr. Serageldin is truly unusual I

2   think primarily as a result of his being in the wrong place at

3   the wrong time.  Because he is really by some counts the only

4   person that has been singled out in a criminal case for what

5   some people call the credit crisis, financial crisis, the media

6   has taken a disproportionate interest in him.

7           And as your Honor knows from some of the materials

8   submitted to you, but also just generally, the amount of

9   publicity around Mr. Serageldin and the nature of the

10  publicity -- I had started representing him from back when he

11  was in the U.K. -- on both sides of the pond, there's a great

12  amount of media that really portrays him as the primary

13  architect in many ways of the credit crisis and really a

14  significant villain in the story, which I think based on the

15  details of the situation as your Honor understands it is

16  disproportionate and inaccurate and unfair.  But he's had to

17  live with the real consequences of that.

18          Yes, he's done something wrong and he deserves to be

19  punished and he is the first one to tell you that.  But I think

20  the way that his name has really been portrayed in the media

21  over the last several years has absolutely destroyed what

22  semblance of self-respect and dignity he had and has destroyed

23  his relationships with many friends and family.  And I think in

24  assessing the deterrence and punishment factors that your Honor

25  has to weigh, I think that is truly unusual and deserves some

1   consideration.

2            THE COURT:  Thank you, Mr. Kim.

3            MR. CASEY:  Your Honor, I want to pick up on a couple

4   points that Mr. Kim left there.  No. 1, in calculating the

5   right amount of punishment that is due here but not greater

6   than necessary, it strikes me as those punishments that Mr. Kim

7   was discussing need to be, need to be factored in or need to

8   reduce the amount of punishment, that is, that you're going to

9   give to Mr. Serageldin.

10            Mr. Kim discussed the press and I won't do that again,

11   but the real punishment that's already been levied on him is

12   when this happened, Credit Suisse took back $25 million in

13   deferred compensation from Mr. Serageldin.  Now, that number in

14   these trading cases when you see millions of dollars and

15   billions of dollars flying around, it's easy to lose to lose

16   perspective on what that means.  But this is actually

17   25 million real dollars going to our client, a life-changing

18   amount.

19            THE COURT:  This is the equity issue?

20            MR. CASEY:  This is the -- yes, your Honor.  This is

21   his deferred compensation.  An important point of that is

22   $20 million of that windfall back to Credit Suisse, $20 million

23   of that was earned long before his conduct ever began.  So this

24   is sort of the beginning of the punishment along with how he's

25   been portrayed in the press.

1          THE COURT:  Why should I consider that?

2          MR. CASEY:  Well, your Honor, when you have to find a

3     sentence --

4          THE COURT:  If someone commits or wants to commit a

5     financial crime and has to give money back, why does that

6     reduce the culpability for the crime?

7          MR. CASEY:  Well, this is different than giving the

8     money back.

9          THE COURT:  Why is it different?

10         MR. CASEY:  Because $20 million of this, the large

11    chunk of this, was earned by Mr. Serageldin years before this

12    conduct even started, years before the credit crisis.  The

13    initial 20 million has nothing to do with his conduct.  It just

14    had to do with the fact of his employment and the way Credit

15    Suisse's compensation regime is designed.

16         THE COURT:  Why is it relevant?

17         MR. CASEY:  Well, because, your Honor, our job here

18    today, the Court's job here today is to find a sentence that's

19    sufficient but not greater than necessary to meet the ends of

20    sentencing and to meet the ends of justice.  And here you have

21    to look at what's already been -- what's on Mr. Serageldin's

22    shoulders.  And here there's $20 million on his shoulder,

23    there's an SEC settlement on his shoulder, there's a million

24    dollars in forfeiture on his shoulder.  He's lost an ability to

25    work in his only profession, his chosen profession.  And as

1    Mr. Kim said, his face has been broadcast across the financial

2    press and will be again today is my estimation.

3           All those things together are something unique to him

4    that we don't see in every white collar case here.  We don't

5    see numbers like that being taken away.  We don't see the cover

6    of the Wall Street Journal on a regular basis portraying most

7    of the white collar defendants that come through this

8    courtroom.

9           The next point I want to discuss a little bit more

10   about the history and characteristics of Mr. Serageldin.  I

11   just want to focus on one part and that part is the unusual

12   extent to which he accepted responsibility here.  When this

13   investigation was going on -- and this investigation took many

14   years to complete -- by the SEC and by Department of Justice,

15   Mr. Serageldin was living abroad.  He was living in London.  He

16   was under no obligation whatsoever to make any contact with the

17   government, but he did.  He was under no obligation to stay

18   even within the reach of the government, but he did.  And when

19   this case became a reality --

20           THE COURT:  Tell me what he did.

21           MR. CASEY:  When the case -- he stayed in London.  He

22   stayed in touch with the Department of Justice.

23           THE COURT:  How did it happen, who initiated what?

24           MR. CASEY:  Oh.  He had previous counsel before Kobre

25   & Kim and they maintained communications.  There was a couple

1    interviews that Mr. Serageldin spoke.

2              THE COURT:  Did Mr. Serageldin approach the Department

3    of Justice first or did the Department of Justice approach

4    Mr. Serageldin first?

5              MR. CASEY:  Immediately upon being charged,

6    Mr. Serageldin hired Kobre & Kim to approach the Department of

7    Justice to arrange a plea agreement with the Department of

8    Justice and also to arrange a settlement with the SEC.  That

9    was our primary task here.

10             With that, he did not fight extradition.  He did not

11   fight the case.  He announced quickly -- and I think the

12   government will support this -- he announced quickly his

13   intention to plead here, to save the government the trial, but

14   really to save the government extradition which, as the Court

15   knows, could have drawn this episode out for years and years

16   even from today.  We could be five or more years from now

17   before this case would really come to a head.

18             THE COURT:  Could also have been prosecuted in London.

19             MR. CASEY:  Yes, your Honor, but our understanding is

20   the British regulators took a pass on this case.  They viewed

21   the conduct here and they decided --

22             THE COURT:  Probably because the Department of Justice

23   was interested.

24             MR. CASEY:  I believe, your Honor, that's possibly a

25   factor, but it also took place before, from what I understand,

DBMLSERS                    Sentence

but Mr. Ingoglia can probably shed some light on that fact.

          I think the way he accepted responsibility here is
almost the model of how the government, how the Court would
want someone to behave just before and certainly after they
were charged by the government.  And I understand he's awarded
some three points under the guidelines for that and that's
significant.  But that's, if he was charged outside on that
street, he would have gotten those three points.
Mr. Serageldin gave up a lot here and what I'm trying to say
here --

          THE COURT:  The point you're making to me is that I
should, in finding a just punishment, take into consideration
the very large amount of rehabilitation that's already
occurred.

          MR. CASEY:  I think that's right, and what that shows
about this man's character and the person that he is, the
person he was before the crime and the person he was after the
crime.  Except for that month or that six weeks of this crime,
we've seen nothing and I think the government will offer
nothing outside of the indictment that he's done wrong in his
life.  He's led an otherwise very admirable life here.

          THE COURT:  Two children.

          MR. CASEY:  Your Honor --

          THE COURT:  Married how long?

          MR. CASEY:  He has three Godchildren, your Honor.  He

1   does not have any children.  He's been with his partner for 14

2   years.

3          THE COURT:  Okay.

4          MR. CASEY:  I want to turn briefly to disparities,

5   3553(a)(6), and the need to avoid the unwarranted disparities

6   that could occur if Mr. Serageldin was given any substantial

7   period of incarceration.  Obviously, the policy here is

8   extremely important.  The policy is that the Court and the

9   courts across the United States will treat similarly situated

10  defendants in the same manner, similarly situated defendants,

11  but also similarly situated people that may engage in the same

12  conduct.  We cited many of these in our brief, and I just want

13  to highlight two of these briefly for the Court.

14         First is a Judge Rakoff sentencing in *United States v.*

15  *Argo*.  *Argo* is essentially a stock options backdating case from

16  a few years ago and that person also pled guilty to the same

17  charge that Mr. Serageldin pled guilty to.  Ms. Argo was the

18  CFO of a public company.  Her guidelines were 97 to 121 months,

19  and Judge Rakoff actually gave her six months.  And I bring up

20  this case not just for the fact of the giant variance from the

21  guidelines, but really for the fact that the conduct here which

22  Mr. Serageldin pled guilty to and options backdating are

23  extremely similar.

24         Ms. Argo's job was to assess the value of certain

25  securities and put those onto the books and records of the

1   corporation.  Hers was actually much more compensation oriented

2   then ours, but this is essentially a mismarking of the value of

3   a certain level of securities.  Obviously, there's distinctions

4   here, but it's very similar conduct.

5           One of the parts of Judge Rakoff's, of the sentencing

6   transcript that I wanted to bring to the Court's attention was

7   this, was that the court was persuaded and certainly credited

8   the argument that what was termed a slightly broader disparity

9   argument.  The slightly broader disparity argument was, as your

10   Honor probably remembers, the stock options backdating scandal,

11   when it broke, there was a lot of investigations, there was a

12   lot of press, there was a lot of investigations within the

13   Department of Justice.  I can attest to that at the time.

14           The end result though, your Honor, very few people

15   actually went to prison.  There were hundreds of restatements.

16   Obviously, a lot of public companies engaged in this conduct,

17   but nobody really went to prison except for Ms. Argo for six

18   months and maybe six or seven other individuals.

19           When that happened, the court seemed to recognize that

20   a certain disparity had already occurred because if people are

21   out there not getting charged for the exact same conduct that

22   one person would be charged with, that's a situation where we

23   have an unwarranted disparity.  I understand the government can

24   get up and say that's not the text in the statute and I would

25   agree with him.  But that's the spirit of this and that's the

DBMLSERS                    Sentence

1    spirit of trying to fashion a just sentence here, trying to

2    look at why a 34-year-old, middle managing director at a bank

3    is the only person charged with this type of conduct.

4          The fact that he may go to prison here today, the fact

5    that he may go to prison here today is a huge unwarranted

6    disparity to what the other people who likely were mismarking

7    portfolios across Wall Street and maybe, as your Honor

8    observed, within Credit Suisse.

9          THE COURT:  It's hard for me to believe that the only

10   cooking of the books case is involving Mr. Serageldin.

11         MR. CASEY:  The only cooking of the books case -- the

12   only case we can find resulting from the credit crisis, this is

13   the case that we see.  If there are other ones in other

14   districts, that's possible.

15         THE COURT:  There's so many cooking of the books.

16   I've had many of them.

17         MR. CASEY:  Yes, your Honor.  If you're talking about

18   accounting fraud or stock options backdating, certainly there

19   are numerous of those.  But a criminal prosecution for

20   something that happened when the credit world sort of came down

21   around Mr. Serageldin's head --

22         THE COURT:  I think if you narrow your definition to

23   such an extent that it makes it meaningless, you get what you

24   say.  I can't accept that.  What's the difference of inflating

25   assets to make out a more attractive IPO than inflating assets

DBMLSERS                    Sentence

1   to post a better 10-K?

2              MR. CASEY:  I agree with that, your Honor, and that's

3   why many of the disparity cases --

4              THE COURT:  So why is Mr. Serageldin's case different

5   from so many others?

6              MR. CASEY:  Because we see a national press call for

7   cases resulting from the credit crisis.  You can find an

8   article once a month in the financial papers saying where are

9   the people that are prosecuted from this?  How come there's

10  nobody senior prosecuted from this?  And the fact -- I don't

11  know if that's true or not and I believe it to be true, but the

12  fact that Mr. Serageldin is one of only a few coming from late

13  2007, 2009 time period is regrettable.

14             THE COURT:  It reminds me of five robbers complaining

15  that the sixth did not get caught.

16             MR. CASEY:  Yeah, I agree, your Honor.  But the

17  problem is --

18             THE COURT:  Surely you have better arguments than

19  that.

20             MR. CASEY:  Maybe I should move on.  In this point,

21  Mr. Serageldin is the sixth robber.  The other five seem to

22  have gotten away.

23             THE COURT:  All right, Mr. Casey.

24             MR. CASEY:  I've move on.

25             THE COURT:  Persuade me, will you please.

DBMLSERS                    Sentence

1              MR. CASEY:  I will, your Honor, I will.

2              The other disparity case I want to bring to the

3     Court's attention is a different form of conduct.

4              THE COURT:  I don't know what prompted Judge Rakoff to

5     give the stock optioner six months and not the guidelines or

6     much closer to the guidelines.  Every case has essential

7     differences to it, so I don't know.  And measuring the impact

8     of the frauds in stock options is different from measuring the

9     impact of the fraud with regard to inflating books.  It's hard

10    to compare those two things.

11             MR. CASEY:  All that we have, your Honor, is the

12    transcript.

13             THE COURT:  We have Judge Chin's sentencing of Madoff,

14    which you'll argue is a much worse situation and I would agree.

15    It's very hard to do that kind of an equation.

16             MR. CASEY:  To look at the disparity cases and find

17    ones that fit perfectly, I a hundred percent agree, your Honor.

18    What we're left with when we have to make the disparity

19    argument is to look at cases --

20             THE COURT:  What's driving the guidelines here?

21             MR. CASEY:  The guidelines are being driven by

22    something that doesn't seem to apply to the case.

23             THE COURT:  Talk to me about that.

24             MR. CASEY:  The compensation --

25             THE COURT:  What's driving the guideline?  How did the

DBMLSERS                    Sentence

```
 1  probation and the government calculate that there should be an

 2  upward adjustment of -- what was it -- 18?

 3          MR. CASEY:  Your Honor, that's derived from the

 4  compensation that, the intended compensation that

 5  Mr. Serageldin --

 6          THE COURT:  How much would Mr. Serageldin have gotten

 7  if he didn't inflate the assets?

 8          MR. CASEY:  He would have gotten the same amount of

 9  money, your Honor.

10          THE COURT:  So why don't you tell me about that.

11          MR. CASEY:  He would have gotten the same amount of

12  money for a number of reasons.  No. 1 is these little --

13          THE COURT:  So there's three components.  Salary would

14  have been the same.  Right?

15          MR. CASEY:  Right.

16          THE COURT:  Equity?

17          MR. CASEY:  Same.

18          THE COURT:  Really?

19          MR. CASEY:  Yeah, and I'll get to that in a second.

20  Three components:  salary, cash bonus, and deferred

21  compensation.  Salary is set.

22          THE COURT:  That's a small amount, that's 279,000.

23          MR. CASEY:  Correct.  Under Credit Suisse's

24  compensation regime, the cash bonus is capped out at a certain

25  number and that number is what Mr. Serageldin received.  If he
```

DBMLSERS                    Sentence

1   would have received another call it --

2             THE COURT:  Is there a discretionary element in the

3   bonus?

4             MR. CASEY:  Of course, your Honor, but there's a

5   serious compensation regime in place.  If Mr. Serageldin at the

6   time he spotted --

7             THE COURT:  Suppose he had a loss.  Would he have

8   gotten the cash bonus?

9             MR. CASEY:  I understand what you're saying.  Your

10  Honor, I think it's important to step back.  If he had a loss

11  in what?  Mr. Serageldin managed a massive number of books for

12  the bank, I think it was 30 of them.

13            THE COURT:  There was a secular decline in the

14  securities that Mr. Serageldin was trading.  It was experienced

15  all over the business.

16            MR. CASEY:  Sure.

17            THE COURT:  And at that particular point in time,

18  there was a question to what extent the loss might or might not

19  be realized.  The loss was really not a loss.  It was the

20  beginning of a trend.  Mr. Serageldin's position made -- there

21  was a large subjective element in the valuation of stocks and

22  securities in the market each day.  Nevertheless, there was an

23  inflation of assets.

24            So what would have happened if Mr. Serageldin's book

25  showed a loss rather than profit, would he have gotten the

1   bonus?  Probably not.

2           MR. CASEY:  I submit, your Honor, respectfully, he

3   absolutely would have received the bonus, absolutely.

4   Mr. Serageldin --

5           THE COURT:  Same amount?

6           MR. CASEY:  Yes, without question, because --

7           THE COURT:  Why did he plead to this?

8           MR. CASEY:  I'm sorry, your Honor?

9           THE COURT:  Why did he plead to this upward

10  adjustment?

11          MR. CASEY:  Because there is a certain marking of a

12  portfolio that has to occur.  And in this book, the ABN1 book,

13  was one of about 32 books.

14          THE COURT:  I grant you that.  But it's driven by

15  loss.

16          MR. CASEY:  It is.

17          THE COURT:  Intended loss to the bank.

18          MR. CASEY:  Correct.

19          THE COURT:  So it leads to me to believe because there

20  is a plea and agreement on this that everyone agreed that the

21  bank lost so much money.

22          MR. CASEY:  There came a moment when Mr. Serageldin

23  looked at how his subordinates and the people he was

24  responsible for were marking the portfolio.  For the most part,

25  they were marking it within an acceptable range.  And then at

DBMLSERS                    Sentence

1   the very, very end of the year, the end of the year he saw and

2   experienced that they had marked outside of the range, and he

3   saw that on the report that was circulated within the bank.  He

4   looked at that report and on that report he saw that these were

5   mismarked.  And that, your Honor, is why he pled guilty because

6   at that point, as Mr. Kim said, he could have stopped this.

7           THE COURT:  There's two aspects to pleading guilty.

8   He pleaded guilty to the statutory offense.

9           MR. CASEY:  Correct, your Honor.

10          THE COURT:  But in the plea agreement, there's also an

11  agreement with regard to the intended loss or the foreseeable

12  loss.

13          MR. CASEY:  Right.

14          THE COURT:  And it's equated with his bonus.

15          MR. CASEY:  Right.

16          THE COURT:  The bonus drove that figure.

17          MR. CASEY:  That's correct, your Honor.

18          THE COURT:  Why did you agree?

19          MR. CASEY:  No. 1, Mr. Serageldin wanted to accept

20  responsibility.  No. 2, in this era with the guidelines still

21  in place and when you negotiate and when he wants to accept

22  responsibility, there are only a number of options left to him.

23          Now, obviously he could have done a couple different

24  things, but that he pled guilty to that number was because

25  that's the number that our world, that 2B1.1 suggests has to

DBMLSERS                    Sentence

drive a case like this.  That's not the law that governs you,
but that's where all the pleas are discussed in cases like
this.  So you do your best.

            THE COURT:  I understand they're discussed, but why
did you agree?

            MR. CASEY:  Because he believed he violated the law
and he did not want to go to trial.  He did not -- he thought
it would be better to save the government the cost and expense
of such a thing.

            THE COURT:  Doesn't the plea agreement state that you
agree that those are the guidelines?

            MR. CASEY:  We agree that those are the guidelines,
and every argument I'm making to you, to be clear, is under 18
U.S.C. 3553(a).

            THE COURT:  Yeah, you have to do that because you're
precluded from going back to the guidelines.  So you can't help
me.

            MR. CASEY:  I can't help you on what question, your
Honor?

            THE COURT:  Why the intended loss should be where it
was.

            MR. CASEY:  The intended loss shouldn't be there.  The
intended loss should mirror something closer to what the goal
of this conspiracy was, at least from my client's point of
view.

1            THE COURT:  The bank takes the position they lost the

2   amount they paid in bonus.  They want it back in restitution.

3            MR. CASEY:  I haven't seen those papers yet, your

4   Honor, but if they do, the couple things I think are very

5   important to keep in mind.  No. 1 is Mr. Serageldin worked for

6   a year.

7            THE COURT:  Do you agree they would be entitled to it?

8            MR. CASEY:  No, your Honor.  Mr. Serageldin worked on

9   a huge amount of responsibility at the bank.  We would call

10  this less than 5 percent of his responsibilities, the ABN1

11  book.  And then within that 5 percent of responsibilities, the

12  actual adjustments that are the center of this, there's an

13  extremely small amount of conduct.

14            And, again, I don't want to undercut the seriousness

15  of this crime and he accepts responsibility, your Honor.  But

16  that the bank didn't get value for the massive and billions of

17  dollars that he made for the bank is frankly an unreasonable

18  argument that the bank would make.

19            THE COURT:  Okay.

20            MR. CASEY:  Your Honor, in closing, I just want to

21  touch on a couple points.  I also have know Mr. Serageldin for

22  a long period of time.  He is a good man.  He is a man that

23  cares very much about others.  He's the kind of person that

24  even today on the way down with whatever is about to happen to

25  him --

1           THE COURT:  There's a deepening mystery in my work:

2     Why do so many good people do bad things?

3           MR. CASEY:  Your Honor, I think the case here is this

4     is people are under an intense amount of pressure.  People sort

5     of have a view of themselves.  They have a view of, you know,

6     I've been really successful academically.  I've been really

7     successful professionally.  And I'm confronted with failure for

8     the first time in my life and they make a mistake and that is

9     what happened here.

10          Now, this is a big mistake and this is a mistake that

11    lasted for more than a handful of weeks, but people make

12    mistakes.  But what we're here for and what really the purpose

13    of 3553(a) is is to get an understanding of the whole person,

14    what Kareem was like before this happened, how he dealt with

15    this after it happened, and what he's going to be like going

16    forward.

17          And under 3553(a), your Honor, I feel like you do, and

18    I agree with your Honor, we have a very good person here, a

19    person who cares a lot about his family, his friends, person he

20    walks by in the street.

21          We saw a recommendation from probation and we believe

22    that is a step in the right direction here.  Maybe not large

23    enough, but we think it's a step in the right direction.  I

24    think and I hope, your Honor, through our papers you're seeing

25    you have a high quality person here, a flawed maybe one that

DBMLSERS                    Sentence

made a mistake, but a flawed person but someone who is good,

who had strived to do well, who has happened people along the

way, a family man, a dedicated family man, and one that has

made a mistake.

          But we don't want -- the press is going to define

Mr. Serageldin by that mistake.  We don't define him by that

mistake.

          THE COURT:  Probation has recommended 36 months.  Do

you think they have it right?

          MR. CASEY:  No, your Honor.  I think they have a step

in the right direction, I do, but.

          THE COURT:  What do you think is right?

          MR. CASEY:  What do I think is right, I would be

persuaded in this case, your Honor, by the massive amount of

punishment he's received.  I would.

          THE COURT:  Everybody who's found out receives that

punishment in one degree or another.

          MR. CASEY:  I'm sorry, your Honor?

          THE COURT:  Everyone who is found out in the crime

he's committed receives that punishment one way or another.

          MR. CASEY:  Thirty-six months?

          THE COURT:  No.  Massive amount of punishment already

achieved.

          MR. CASEY:  Okay.  We're going to have to disagree on

that, your Honor.  What I would give, I would sentence him to

1    no jail time or extremely nominal amount of jail time.  And for

2    the deterrence factor here, I would point to what has happened

3    to him.  In the government's papers they point to their

4    deterrence argument.

5              THE COURT:  That's no deterrence.

6              MR. CASEY:  What's that, your Honor?

7              THE COURT:  You're found out on your crime, you give

8    up your criminal acts.  You give up your criminal gain.  That's

9    a deterrent?

10             MR. CASEY:  No, your Honor, I'm not getting through.

11   The first $20 million has nothing to do with his crime.  I

12   actually argue --

13             THE COURT:  That's not what the public ruling said.

14             MR. CASEY:  I think, your Honor, as the government

15   writes in its brief, the people we want to deter are other Wall

16   Street professions like Mr. Serageldin who maybe would have to

17   make that decision tomorrow.

18             THE COURT:  And how do you deter them?

19             MR. CASEY:  How do you deter --

20             THE COURT:  By saying if you're found out, you give up

21   what you got?

22             MR. CASEY:  No, your Honor.  I think you can easily

23   look at what happened to Mr. Serageldin's life since that day

24   and his life has been ruined in every single respect and

25   financially is one of them, but that's not even, that's not the

1    big one.  He's unemployable.  He has lost face to his family.

2                 THE COURT:  History shows that every one of the people

3    who went on to Wall Street and did something wrong and came

4    back out of jail and did something again find something again.

5    So to argue that Mr. Serageldin's future is bleak now is a

6    misguided argument.  It insults your client, it insults your

7    client's capability, and it insults your client's background.

8                 Sure, he'll be punished and sure he'll have

9    repercussions and consequences.  But to get me to believe that

10   he won't be able to get back on his feet again, I don't believe

11   it.

12                MR. CASEY:  I agree with you, your Honor.

13                THE COURT:  So why are you telling me that?

14                MR. CASEY:  But not to the level of where he was.

15                THE COURT:  Of course not.  He committed a crime.  He

16   committed a serious crime.  Shouldn't he be punished?

17                MR. CASEY:  He should, your Honor, and I believe he

18   has.  And, your Honor, I believe if you needed to punish him,

19   there are other ways to punish him besides a 36-month --

20                THE COURT:  Like what, community service?

21                MR. CASEY:  Yes, your Honor, or a financial penalty.

22                THE COURT:  That too.  Okay.  Thank you very much.

23                MR. CASEY:  Thank you, your Honor.

24                THE COURT:  Mr. Ingoglia.

25                MR. INGOGLIA:  I'm going to try to respond to the

1    points your Honor wants to hear.  There are a couple things

2    defense counsel said.

3            THE COURT:  I think that level of 25 overstates the

4    seriousness of the offense.

5            MR. INGOGLIA:  First I wanted to clarify how that's

6    calculated because it's not simply calculated on the basis of

7    Kareem Serageldin's bonus.  Also included in that calculation

8    is the bonus that David Higgs got, his coconspirator, who

9    incidentally is when we're talking about other financial crisis

10   cases that have been charged, there are two of Mr. Serageldin's

11   coconspirators who have been charged in this district.

12           THE COURT:  People in his group.

13           MR. INGOGLIA:  Yeah, people in his group, Mr. Higgs

14   and Mr. Siddiqui.

15           THE COURT:  Who have lesser culpability.

16           MR. INGOGLIA:  Correct.

17           THE COURT:  One would argue.

18           MR. INGOGLIA:  Correct, they're subordinate to him in

19   the hierarchy of Credit Suisse.  Mr. Higgs got a bonus of

20   1.6 million.  Salmaan Siddiqui got a bonus of 930,000, roughly.

21   And another coconspirator got a bonus of 250,000.

22           Even if you took out Mr. Serageldin's bonus -- and I

23   want to talk about that in a minute; I don't think that's the

24   right way to look at it -- but even if you took out, if you add

25   the bonuses of the coconspirators, you're still over that

DBMLSERS                    Sentence

1    2.5 million number.  You're in that same guidelines range.

2                 THE COURT:  This argues that they got their whole

3    bonus because of the overstatement.

4                 MR. INGOGLIA:  But he argued it with respect to his

5    particular situation because he had --

6                 THE COURT:  I think it's very complicated.

7                 MR. INGOGLIA:  But with respect to Higgs it's not.

8    With respect to Salmaan Siddiqui it's not.  Their primary

9    responsibilities were this book, this particular book that had

10   the fraud in it.  And I think this argument is suggested in the

11   defense submission as well.  With respect to Higgs, Higgs'

12   bonus turns on how well that book does.  If that book does

13   crappy, he's not getting a big bonus, he just isn't.

14                And Salmaan Siddiqui, same thing.  His job is, you

15   know, putting those marks on that book.  He doesn't have that

16   vast array of books that Mr. Serageldin had.  He didn't have

17   that broad degree of responsibility that Mr. Serageldin had,

18   it's true.  But their bonuses are much more tightly tied to

19   that performance in that particular book.

20                It makes sense.  You got to start from consider what

21   the options are for trying to come to a fair guidelines

22   calculation here.  Nobody is arguing it was the amount of the

23   restatement.  Nobody is arguing it was the amount of the

24   overall misstatement in the book, right.  Those are giant

25   numbers.  Nobody is arguing that.

1              The compensation, the intended compensation of the

2      group that was involved in the mismarking makes perfect sense

3      as a proxy.  And even if you take Kareem Serageldin's bonus

4      out, it's still the same level we've been talking about, still

5      at 25 because you're over 2.5 million.

6              And I submit to you that's a likely reason why, I

7      don't want to speak for the defense, but it makes sense that

8      they would agree to something like that for that reason.

9              THE COURT:  It's idle for me to really make a precise

10     finding on how much of the bonus depended on the mismarking of

11     the books and the cooking of the books.

12             MR. INGOGLIA:  Can I make one other observation in

13     that regard, if I may, common sense argument, not an I'm privy

14     to secret information argument.  If Credit Suisse had known

15     that a crime was happening, that people working for them were

16     committing a crime, at the time they were deciding whether or

17     not to pay a bonus --

18             THE COURT:  There would be no bonus at all.

19             MR. INGOGLIA:  -- there would be no bonus at all.

20             THE COURT:  Let me ask you this.  Suppose they had not

21     falsified books, would there have been any bonuses?  We don't

22     know, do we?

23             MR. INGOGLIA:  I don't think we know to a certainty.

24     I think if there had been no, there had been no mismarking,

25     then I think Mr. Serageldin has a fair argument that some of

1    his other activities would have gotten him at least some bonus.

2    I don't know if we can know what the amount would have been,

3    but I think it's persuasive he had a lot of responsibility.

4             THE COURT:  I can't accept the argument that the

5    entirety of the bonuses depended on the falsified books.  I

6    think it was influenced, it was affected, but I can't say it

7    was total.  So I come to the conclusion that there's a certain

8    degree of overstatement of points.  How much, I don't know.

9             MR. INGOGLIA:  I won't belabor it if you've come to

10   that conclusion.

11            THE COURT:  Under 5K2.0, I would tend to find that

12   there should be some element of departure.  Even though you and

13   defense counsel agreed on the application of the guidelines, I

14   wouldn't go along with you.  I don't think it's necessary for

15   me to find exactly how much departure there should be, but I

16   think 57 months is high.

17            What do you think of the probation office

18   recommendation of 36 months?

19            MR. INGOGLIA:  We think it's too generous.  We

20   think --

21            THE COURT:  Why do you think it's too generous?

22            MR. INGOGLIA:  Especially because -- and Mr. Casey is

23   right that this is a primary part of our argument -- the need

24   for general deterrence in a case like this is especially

25   important.  I think when there's talk, you know, in your

1   colloquy with defense counsel about why good people do bad

2   things, and it could be intense pressure, it could be hubris,

3   it could be greed, right, there's many things that could

4   motivate people at different times.

5          But the fact that, you know, you keep seeing good

6   people do bad things and that in cases like this people who

7   otherwise seem to live admirable lives do cross the line, that

8   cries out for a strong deterrent message.  That's what it cries

9   out for.  You need somebody in that situation to say to

10  themselves, wow, it's tempting, it's going to be very hard for

11  people to detect if I mess around with something like this, but

12  it's not worth the risk of going to jail.  You need that kind

13  of strong message.

14         THE COURT:  A zero sum game doesn't do it.

15         MR. INGOGLIA:  Correct.

16         THE COURT:  Which is what Mr. Casey is arguing.

17         MR. INGOGLIA:  I think that's right.  You've got to

18  deter people from crossing that line.  And how you're going to

19  do that, it has to be a serious sentence.

20         THE COURT:  The judges don't know, nobody knows what

21  level of deterrence you need and what's accomplished by one

22  sentence over another.  So we still are in the land of

23  intuition.

24         MR. INGOGLIA:  I think that's right, Judge, and I

25  think that it's the burden and challenge of where you're

DBMLSERS                    Sentence

1    sitting, right, in setting a sentence.  I agree a hundred

2    percent.  Finding the right balance is what you've got to do.

3              THE COURT:  Another thing that bothers me here, that

4    Credit Suisse created a climate.  We learned that there was a

5    hundred billion dollars of overstatement.

6              MR. INGOGLIA:  It says more than a hundred, more than

7    a hundred million.

8              THE COURT:  Hundred million dollars.

9              MR. INGOGLIA:  More than a hundred million.

10             THE COURT:  Easy for me to substitute zeroes, take

11   them away and add them on.  A hundred million dollars of

12   overstatement.

13             And the share of overstatement in Mr. Serageldin's

14   department was how much?

15             MR. INGOGLIA:  I'm sorry, I was answering the second

16   question.  They restated by more than a billion dollars, right.

17             THE COURT:  The bank misstated for a billion dollars.

18             MR. INGOGLIA:  It's actually more than.  I can --

19             MR. CASEY:  Your Honor, we have the number.  The bank

20   restated for over $2.65 billion.

21             THE COURT:  2.65 billion.  And how much --

22             MR. CASEY:  The overstatement, the government's

23   position, I believe, is about a hundred million dollars.  It

24   may even be slightly more.

25             THE COURT:  Say that again.

1          MR. CASEY:  The government's position I think is a

2     hundred million.  Our position is that number is also

3     exaggerated.

4          THE COURT:  What is the number that you think should

5     be attributed to the inflation of Mr. Serageldin's

6     responsibility?

7          MR. CASEY:  A little less than $40 million, maybe even

8     less than that.

9          THE COURT:  What do you say, Mr. Ingoglia?

10         MR. INGOGLIA:  More than a hundred million dollars.

11         THE COURT:  Let's take a hundred million.  So what

12    percent of 2.65 billion?

13         MR. INGOGLIA:  A very low percent.

14         THE COURT:  Which means that there was either a

15    terrible climate in the bank because people tend to know what

16    other people are doing.  And Mr. Serageldin's crime, and it is

17    a crime, was a crime that was duplicated by many others in many

18    other departments.  I think that's a fair inference for me to

19    take, and I have to put that into finding the fair sentence

20    also.  It doesn't mitigate his crime, but it does mitigate his

21    culpability in a sense.

22         MR. INGOGLIA:  I think all I can say to that is we

23    take the facts as we find them.  Where we see evidence of a

24    crime, we pursue it and we prove what we can prove.

25         THE COURT:  I understand.  It's not always easy.

```
 1    Quite hard.  I know because I worked in that area.  I know how
 2    hard it is to prove that.
 3              Thank you, Mr. Ingoglia.
 4              Mr. Serageldin, you have a right to --
 5              MR. CASEY:  Your Honor, before Mr. Serageldin speaks,
 6    his mother would like to address the Court very briefly if that
 7    would be okay.
 8              THE COURT:  Okay.  Come up, ma'am.  Tell your name to
 9    the court reporter.
10              MRS. SERAGELDIN:  Sarheeldin Serageldin.
11              Thank you very much, your Honor, for allowing me to
12    speak to you today.  I'm Kareem's mother.
13              THE COURT:  Please speak louder.  It's not going to
14    help you much.  You need your voice.  And I know you're
15    nervous.  So just try to relax, speak slowly and loudly.
16              MRS. SERAGELDIN:  Thank you very much, your Honor, for
17    allowing me to speak to you today.  I'm Kareem's mother and
18    this is, as you must imagine, very difficult because I know I
19    have just this one chance to try to present my son to you the
20    way I know him to be, which is a very kind, loving,
21    responsible, upright, modest young man.
22              And I don't know, I don't understand much about,
23    actually anything about the offense.  Obviously, I'm not here
24    to talk about that.  But I just would like to speak to your
25    Honor about my son.
```

DBMLSERS                    Sentence

1              I know we raised him to value honor and integrity and

2     he's always held himself up to high standards as far as I know.

3     And we came to this country, my husband and I, immigrated to

4     this country when he was not quite seven years old.  He was

5     going on seven.  And it was a struggle, as with many immigrant

6     families, especially at the beginning to, you know, to make a

7     living and raise our children.

8              And I think Kareem saw us struggle and he really

9     internalized those values of really hard work and high

10    expectations.  And we never once had to ask him to study and he

11    always tried to exceed our expectations for him if he could and

12    he always did, which is why it's so hard to be talking to you

13    about him today because we've always been so proud of him.

14    He's always made us so proud.

15             And it's also so hard to see him suffer and when you

16    see your child suffer, you suffer.  And he has been suffering

17    horribly in the five plus years since this ordeal started.  He

18    was only 34 and his whole world came to an end.  And he's been

19    hounded, hounded from his homes, you know, first one apartment

20    in London, then another one, humiliated and publicly arrested.

21    And when he never tried to, you know, he's always available,

22    but still he was made a public spectacle of.  And he's already

23    suffered so very much with the stress of seeing him throwing up

24    time after time.  And he tries to hide it as best he can

25    because that's how he is, but he's really suffered horribly and

1    we all suffer with him.

2          We're a close family and he's the rock of the family.

3    It's his character that he's protective, responsible one.  But

4    also partly in Egyptian culture, and we're from Egypt, it's the

5    oldest son who takes the responsibility.  And it's not just me

6    and his father and but his whole extended family.

7          When his uncle had a heart attack, he was visiting

8    London and he had a heart attack, it's Kareem who took care of

9    everything and took care of him, nursed him after, took him

10   home and nursed him after.  And his uncle said so many times

11   since then while he was being rushed off in the ambulance, at

12   least he knew if anything happened to him, he'd look after his

13   family in Egypt.

14          I'm sorry, your Honor.  I'm know I'm rambling.

15          THE COURT:  You're not rambling.  Take your time and

16   tell me what you want.  I know you're speaking from the heart.

17          MRS. SERAGELDIN:  I just want to say, your Honor, I

18   wish I could show you the six-year-old he was when we came to

19   the States.  And he was small for his age, but he also, we had

20   him skip a grade so he was really tiny for his class and he was

21   teased so horribly and bullied so much.

22          THE COURT:  You're speaking to a very short person.

23          MRS. SERAGELDIN:  But he stayed that way, your Honor,

24   for the longest time.  And, you now, he was really teased and

25   bullied and it wasn't just how tiny he was, but also his thick

glasses and bushy hair and he had all the odd clothes and odd

accent.  And I think he just felt he always had to work twice

as hard as everyone else to be accepted.  And he always had to

get things exactly right because no one would ever give him any

leeway and he just, he's still that way inside, you know, the

little boy who always has to get everything right and work

twice as hard as everyone else.

     And I know he probably doesn't want me to say this,

but he's very vulnerable inside and tries to hide it.  But we

know, his family, his close friends, we all know how

self-guarded he is and how vulnerable he is and how much he

tries to hide it.  And we all need him so much.  Not just us, I

mean his father and I, his brother, but most also Kareem has a

woman, they've been together for 14 years.  She wouldn't want

me -- she'd be lost without him.  I know she won't mind my

saying that.  And they haven't really started their life

properly together because everything has been put on hold

because this, since this started over five years ago, they

can't make plans, they can't.  So there's that as well.

     And most of all, your Honor, if you will just indulge

me one last thing, that's my mother who, his nana, my mother.

When he was born, we were students at London University, my

husband and I, both of us.  And we couldn't -- we left him with

my mother to raise the first few years of his life in Egypt

with my mother and he's been the center of her universe ever

DBMLSERS                    Sentence

since and they have a very, very close, close bond.  And he

used to visit her regularly and he hasn't been able to travel

to see her in two years.  She's 85, she's frail.  We can't

possibly tell her what's going on because it would be the end

of her, quite literally, the end of her physically.  She

wouldn't survive the shock.

        So we haven't been able to explain why he no longer

comes to see her and it breaks his heart because he knows that

she may not be there much longer, you know.  And so I know she

would be here today if she could and obviously she can't.

She's in Cairo and doesn't travel, hasn't for years and we

haven't even told her.  But I just wanted on her behalf and on

behalf of everyone in the family to let your Honor know about

her as well.

        The other thing please, your Honor, keep in mind his

whole life history.  He was only 34.

        THE COURT:  How life?

        MRS. SERAGELDIN:  His whole life history.  He was only

34 and all his life he's been so responsible, so hardworking.

He started working barely out of college and he was 21 in April

the year he granted college and he started working and worked

so hard every day, never, you know, always, always worked so

hard and it was never, never for him about, I know that.  It

was always about winning that respect and approval that he had

such a hard time winning when he was a little boy in high

DBMLSERS                    Sentence

school and so awkward and it's all about winning respect and

approval for him.  It was never, you know, achievement for him

was never anything material.  The only thing that might have

gratified him was treating friends, family to treats or

experiences he thought they might enjoy.  But for him it's

always been about winning that respect and approval that were

so hard, the acceptance that were so hard to come by as he was

growing up.

          So if you would just please see him in context of his

whole life history, if you would, your Honor, and keep in mind

that as a mother when he suffers, you suffer, and whatever

sentence he serves, you serve, and you only breathe free when

he does.  And also that I know my son.  He would never ever

conduct himself in a way as to be unworthy of your Honor's

generosity should be choose to exercise it.  And I'm really

sorry.  Thank you very much, very much.

          THE COURT:  Thank you very much for your remarks.

          It's unfortunate that sometimes, most often the most

substantial impact of sentencing is not on the defendant

himself but on those who love him.  I see this so many times.

In a way, a defendant comes and he has prepared himself for the

worst, but his family never does.  And so when I pronounce a

sentence, the people who feel it most are those who love the

defendant.

          The other thing I wanted to say is it's my obligation

DBMLSERS                    Sentence

to take into account all the personal characteristics of the
person I'm sentencing.  The law requires it and I try to do it
as best I can.  And I particularly appreciated your remarks
because I too am a son of immigrants who came to the United
States to find an opportunity that they never would have had
had they not immigrated.  In fact, they probably would not have
been alive today.  Today they're not alive, but when they came
here.

          So I understand your remarks and I appreciate them
very much.

          Mr. Serageldin.

          THE DEFENDANT:  Your Honor, today is the most
difficult day of my life.  I never imagined I would be standing
here awaiting sentencing for a crime.  Your Honor, I'm sorry
for what I have done.  My terrible mistakes will remain with me
for the rest of my life, mistakes that I'll have to explain
shamefully to my Godchildren, as well as the children of my own
I hope to have one day.  I'm confident that I will never make
these mistakes again, and I am certain I will never allow
myself to be in a position like this again.

          Throughout the course of this case, I have tried to
conduct myself with dignity to prove to myself and to all those
that I've let down that I'm better than my crime.  Your Honor,
I always believed by working harder than anyone I could succeed
at almost anything.  That was the case throughout my education,

DBMLSERS                    Sentence

1    as well as my time at Credit Suisse.  I was proud of the

2    reputation I built at the bank.  Your Honor, I loved my job.

3    My terrible mistakes have caused me to lose my job, my career,

4    my reputation, and caused great dishonor to myself, but more

5    importantly, to my family and friends.

6         When I became aware of the conduct that brought me

7    here, the right thing to do would have been to stop, correct

8    and address the misconduct.  I recognize that this was a

9    crucial moment of my life and I see that I failed miserably in

10   the decisions I made at this time.  What is most painful to me

11   is the knowledge that my actions have hurt and humiliated those

12   that I love and care about the most, my family, my Godchildren,

13   my friends, as well as colleagues, all of whom put their trust

14   and confidence in me.  I deeply apologize to them for the pain

15   that I've caused them, and I thank them for their unconditional

16   support over the course of the five plus years of this

17   investigation.

18        In many ways, I do not deserve all of the support that

19   I've received.  It only adds to the shame and guilt I feel for

20   having betrayed the trust and confidence they had in me.  I

21   made commitments in life to support family and friends.  I have

22   always upheld those commitments until now.  It is therefore

23   exceedingly difficult to imagine that going forward I may not

24   be in a position to do so.

25        Many people rely on me, your Honor, which is what

makes this so very hard.  This is particularly true of my

grandmother, who's too old and frail for me to explain to her

why I can't probably ever be by her side again in Cairo.

I stand before you, your Honor, to accept whatever

punishment you deem appropriate.  I wish to have the

opportunity to pay my debt to society and then to move forward

and rebuild my life.  I would only add that I pledge to prove

worthy of your Honor's clemency should you grant it.  I will

not let you down.

Thank you, your Honor, for permitting me to address

the Court today.

THE COURT:  Thank you, Mr. Serageldin.

Any district judge would be quick to say that the most

difficult job of being a United States district judge is the

job of sentencing human beings.  We have the power to take away

freedom from people.  It's an awesome power.  And for me, I

never feel I get it right.  You've already heard some of the

comments I made as I tested both sides in the views they bring

here.

There are so many different considerations the judge

has to follow and they don't mesh.  One stands in opposition to

another.  And there is no scientific way of putting it all

together in coming to a conclusion that's satisfactory, not to

the defendant, not to the government, and not to the judge

himself for, as I say, I never have confidence that I have

gotten it right.  All that I can do is do the best I can to
harmonize all the considerations that come to play.

         So Section 3553(a) of the criminal code tells the
judge what considerations the judge should consider in
sentencing a person.  The judge is required to understand the
nature and circumstances of the offense, and many of my
questions have been probing of that nature and the aspect of
the offense, which was the intended loss or the foreseeable
loss to the employer.

         I also have to understand the history and
characteristics of the defendant.  Your mother was eloquent in
pleading your case.  You could not have done what she's done or
said what she has said.  She spoke from the heart and it
penetrated.

         But that is not enough because I also need to consider
a sentence that reflects the seriousness of the offense.  And
Mr. Ingoglia talked about the need of imparting a sentence that
will be taken as serious in the community of those who have to
work in the fields where you worked.

         The sentence has to promote a respect for law and to
provide just punishment for the offense.  Respect for law is
crucial.  People can't feel that there's one law for the person
who committed a misbranding of drugs, who I sentenced before I
reached you this morning, and for a person who works and lives
at the highest echelon of our society.  It's one law and one

DBMLSERS                    Sentence

1    law that must be just for everyone.

2            And it's so hard, so hard to make comparisons to what

3    one judge did for one person and what I must do for another

4    person or in what way I sentence one particular person and then

5    have to sentence another person.  Everyone is different.  It

6    used to be that we would have the comfort of adding up the

7    score in the sentencing guidelines and sentencing so that

8    everyone thought there was equality, but there never was

9    equality.  There always were hidden considerations that either

10   were or were not taken into consideration.

11           And so we've abandoned the sentencing guidelines as a

12   rigid code.  We are to consider them, among other things, but

13   the judge is left on his own to find what is just, what is

14   fair, what is appropriate.

15           I'm instructed to sentence in a way to afford adequate

16   deterrence to criminal conduct.  It's so important deterring

17   not only the defendant himself, which I'm convinced you will

18   not commit another crime and that any time you have a choice to

19   make, you will choose very carefully in relationship to what is

20   right and what is good and not been done those ideals.  But

21   others have to be influenced as well, and it's another aspect

22   of how the community has to respect law and understand the

23   seriousness of the crime that was committed.

24           I'm told I have to protect the public from further

25   crimes of the defendant, which is not an issue with you, I am

sure, but it is an issue with others.

         And I'm supposed to provide you with needed
educational or vocational training, medical care, or other
correctional treatment in the most effective manner, and I
don't think these really apply to your case.

         In all of this, I'm to impose a sentence that is
sufficient but not greater than necessary to comply with all
these considerations.  If one were to devise a set of criteria
that will be more apt to cause consternation on the part of
anyone having to apply them, it couldn't be other than these
characteristics.  Yet this is how I have to live, and this is
how I have to conduct my sentences, to do what ultimately has
to be fair and just.

         And so I have to consider that you were in a position
of trust and responsibility.  In a financial world that was
rather berserk at the time, each person has to look within
himself and ask himself what is right, what is wrong, how do I
adhere to the right and not do the wrong.  Inflation of books
is a wrong.  Everyone working in the financial area knows that.
Everyone in the financial area knows also the subjectivity of
judgments, especially in an area where there is not an adequate
market index.

         And yet in all that with all the complexity, with all
the difficulty, with all the tension and responsibility that
comes into play, one must never forget to ask the question what

1    am I compelled to do if I adhere to the right and in that you

2    failed.  And I understand this has been a five-year ordeal for

3    you and that this ordeal has recked its own sense of punishment

4    for you.  You had to stand still.  You have not been able to

5    correct the past and go forward and I take this into

6    consideration as well.

7            I take into consideration that the guidelines in terms

8    of how it's driven by the amount of the loss is a very

9    substantial overstatement, but yet your crime is a serious one.

10   It has to teach people that in the worst of times what is right

11   can not be sacrificed.  We may not have gone through the worst

12   of times.  We did not get into a depression.  People did not

13   lose a whole society of economic structure.  Many lost their

14   jobs, many lost their ability to earn a good living, but

15   somehow we passed it.  But you failed in doing what was right.

16   For this I have to punishment you.

17           I'll ask you to stand, Mr. Serageldin, while I deliver

18   what I think is a fair and just punishment.

19           I sentence you to 30 months in custody.  It's

20   substantially less than the guideline range of 57 months, which

21   I believe is an overstated amount.  It's even less than

22   probation has suggested.  But I've taken into consideration

23   what your mother has said, what your lawyers have said about

24   you and all that you bring to the table.  I'm convinced that

25   perhaps by showing you a little more lenity than otherwise

DBMLSERS                    Sentence

might be available, but also sufficient severity to make it

clear that this is a serious offense, that I have done as best

I can to apply all the intentions of the guideline and

characteristics that apply.

          Is there a recommendation where Mr. Serageldin should

serve?

          MR. CASEY:  Your Honor, we have an idea, but if

possible, we'd like to submit it in writing to you maybe

Monday.

          THE COURT:  Yes.

          MR. CASEY:  Okay.  Thank you, your Honor.

          THE COURT:  A writing about where I should recommend?

          MR. CASEY:  That's correct, your Honor.

          THE COURT:  Okay.  So we'll defer the judgment until

we receive that and I'll undoubtedly make the recommendation as

suggested.

          MR. CASEY:  Thank you.

          THE COURT:  I'll talk about supervised release in a

few minutes.

          There is a forfeiture in this case, is there not?

          MR. INGOGLIA:  There's an agreed to amount, yes,

Judge.

          THE COURT:  And you'll submit a judgment?

          MR. INGOGLIA:  We will.  We'll submit, if your Honor

is okay with it, next week.  We'll submit a preliminary, on

1   consent by the parties, a preliminary order of forfeiture.

2           THE COURT:  And it will be in the amount

3   $1,003,368.61?

4           MR. INGOGLIA:  That's correct.

5           THE COURT:  In terms of restitution, is there any --

6   you can sit down for a few minutes, Mr. Serageldin.

7           THE DEFENDANT:  Thank you.

8           THE COURT:  Is there any suggestion about restitution?

9           MR. INGOGLIA:  It's discretionary, we believe, in this

10  case.  So it is up to your Honor.

11          THE COURT:  Well, it's discretionary in what sense?

12  It's mandatory, isn't it?

13          MR. INGOGLIA:  The statute to which the defendant pled

14  is not included among the mandatory restitution list of

15  enumerated statutes.  So the issue of restitution is entirely

16  within your discretion, whether to order it or not and also to

17  what extent.

18          THE COURT:  Do you have a suggestion how I should

19  exercise my discretion?

20          MR. INGOGLIA:  I don't, Judge.  I think we should

21  leave it to your recommendation.

22          THE COURT:  Is there any representative of Credit

23  Suisse here?

24          I believe that restitution is not appropriate.  I

25  think the bank, having created a climate in which

1   Mr. Serageldin has operated and not having shown to what

2   extent, if at all, the bonuses paid to him would not otherwise

3   have been paid, is not entitled to restitution.  If it is

4   entitled to restitution, it feels that way, it can bring a

5   separate action.  But I do not order restitution in this action

6   without prejudice to whatever may be determined in some other

7   lawsuit.

8          I think a fine would be appropriate.  Does the

9   government have a suggestion?

10         MR. INGOGLIA:  We're not recommending any specific

11  amount, Judge.  We would leave it to you.  The range as you

12  pointed out is the guidelines.

13         THE COURT:  Tell me about the forfeiture, is it an

14  amount that was found?

15         MR. INGOGLIA:  The amount of the forfeiture is

16  calculated by taking the amount of the bonus, which was

17  1.7 million, and essentially -- let me start over.  The 1.7 was

18  the amount of the bonus.  He actually received the amount of

19  the forfeiture, $1,003,368.61, because that is what the amount

20  was actually paid after taxes.

21         THE COURT:  So, in other words, it's in a sense what

22  he got from.

23         MR. INGOGLIA:  It's the bonus.

24         THE COURT:  Okay.  I think a fine in addition would be

25  appropriate.  The guidelines provide a fine of $10,000 to a

DBMLSERS                    Sentence

 1   hundred thousand dollars.  I'm going to impose a fine of

 2   $150,000.

 3            When can it be paid?

 4            MR. CASEY:  Within 30 days, your Honor.

 5            THE COURT:  Paid let's say by January 15.

 6            MR. CASEY:  Thank you, your Honor.

 7            THE COURT:  2014.

 8            Supervised release will be for two years, subject to

 9   the following conditions:  those set out at the top of page 3

10   under the caption in the PSIR mandatory conditions, plus the 13

11   standard conditions.

12            I decline to impose the financial conditions in the

13   third, fourth, third and fourth paragraphs under standard and

14   special conditions on page 29.

15            And impose the condition of obeying the immigration

16   laws and complying with the directives of immigration

17   authorities.

18            Mr. Serageldin will be supervised by the district of

19   his residence and is to report to the nearest probation office

20   within 72 hours following release from custody.

21            The mandatory special assessment of $100 will be due

22   upon the filing of the judgment.

23            I want to impose an obligation of community service

24   for the two years of supervised release at the rate of 25 hours

25   per quarter, 25 hours per quarter for each of the two years.

DBMLSERS                    Sentence

 1  Mr. Serageldin and his lawyers will suggest a type of community

 2  service to the probation officer, and it shall be subject to

 3  the approval of the probation officer.

 4          When would Mr. Serageldin like to surrender?

 5          MR. CASEY:  The end of January, your Honor, if that's

 6  possible.

 7          THE COURT:  Yes.

 8          THE DEPUTY CLERK:  January 28 --

 9          MR. CASEY:  Thank you.

10          THE COURT:  -- 2014, at 2 p.m., at the facility

11  identified by the Bureau of Prisons.

12          MR. CASEY:  Thank you, your Honor.

13          THE COURT:  Except for advice on appeal and underlying

14  counts, is there anything I missed, Mr. Ingoglia?

15          MR. INGOGLIA:  No, Judge.

16          THE COURT:  Any suggestions, objections?

17          MR. INGOGLIA:  None.

18          THE COURT:  Objections by the defense?

19          MR. CASEY:  Nothing, your Honor.  Thank you.

20          THE COURT:  So all the punishment is so ordered.

21          I advise you, Mr. Serageldin, that you have a right to

22  appeal.  You should discuss with counsel whether or not you

23  wish to appeal.  If Mr. Serageldin wishes to appeal, I instruct

24  counsel to do so on a timely basis.  Counsel will review the

25  plea agreement to see if appeal is waived.  In any event, it's

DBMLSERS                    Sentence

1    Mr. Serageldin's choice.

2              If you can't afford a lawyer, Mr. Serageldin, you have

3    a right for counsel at every stage of the proceeding and the

4    government will pay for a lawyer and it will be assigned under

5    the Criminal Justice Act.

6              Underlying Counts Two and Three.

7              MR. INGOGLIA:  Counts Two and Three the government

8    moves to dismiss.

9              THE COURT:  Without objection so ordered.

10             I think we're concluded.  Anything further?

11             MR. INGOGLIA:  Nothing further from the government.

12             THE COURT:  So, Mr. Serageldin, this in a way closes a

13   chapter in your life, opens another chapter, which will be

14   difficult, but it's something you can accomplish.  You can find

15   good in any place if you look for it and pursue it.  And

16   thereafter, you're a young man and your life remains an open

17   book.  I'm sure you will learn from it and be a better person

18   for it.  People love you.  And I wish you the best.

19             THE DEFENDANT:  Thank you, your Honor.

20                            o0o

21

22

23

24

25